### GENERAL TERM,

###### HELD AT

### BURLINGTON, JULY, 1858.

---

**PRESENT:**

HON. ISAAC F. REDFIELD, CHIEF JUDGE.
HON. MILO L. BENNETT,
HON. LUKE P. POLAND,
HON. ASA O. ALDIS,           } ASSISTANT JUDGES.
- HON. JOHN PIERPOINT,
HON. JAMES BARRETT,

---

JONATHAN STURGES AND THOMAS DOUGLASS *v.* SHEPHERD KNAPP, GEORGE BRIGGS, AND THE TROY & BOSTON R. R. Co.

[IN CHANCERY.]

*Powers and duties of Trustees under a mortgage made by a Railway Company to secure the payment of its bonds. Construction of an agreement, in a lease of a railroad, to return the road at the*

*end of the term, in as good condition and repair, as it was in at the beginning, natural wear only excepted. Corporations. Trusts.*

The Western Vermont Railroad Company executed a mortgage, in the ordinary form, of their railroad and franchise, to secure the payment of their first issue of bonds, being five hundred in number, and amounting to four hundred thousand dollars. This mortgage was made to K. and B. as trustees for the bondholders, and contains no provisions in regard to the rights or duties of the trustees, either before or after foreclosure. In consequence of a failure to pay these bonds this mortgage was foreclosed, and a decree, in the ordinary form was made, simply decreeing that, if certain specified sums were not paid on or before certain specified times the mortgagors should be foreclosed from all equity of redemption in the mortgaged property. One of these payments becoming due January 1st, 1857 was not made, and the title thereby became absolute in the trustees. The bondholders at that time had no legal organization, but were very numerous and resident in different parts of the country, some of them being under legal incapacity to act *sui juris*, neither did the trustees fully know who they all were. The trustees, had no rolling stock for the road, nor any means of purchasing any. Immediately on the expiration of the decree the trustees requested C., who had previously been running the road under the receiver of the court of chancery, pending the foreclosure suit, and who owned rolling stock, to continue running it for a short time until definite arrangements could be made, which he accordingly did, until the execution of the lease hereinafter mentioned. On the 9th of January, 1857, certain persons authorized by the orators, and claiming to represent bondholders, the number or names of whom, however, were not mentioned on the one side or inquired for on the other, in behalf of themselves and other bondholders, requested the trustees not to lease the road until the views of the bondholders could be ascertained at a meeting to be called for that purpose. On the 16th of January, 1857, the operation of the road by C. in the meanwhile having resulted in a loss, the trustees leased the road to the Troy and Boston Railroad Company, a corporation created by the state of New York, and owning a connecting road, for ten years from that date, at a specified rent of twenty-five hundred dollars per month for the first year, and three thousand dollars per month for the remaining time, payable monthly in advance, with a provision for the termination of the lease in case of a neglect to pay the rent for ten days after it became due, and a covenant on the part of the lessees to return the road at the termination of the lease, in as good condition and repair as it was then in, natural wear only excepted. The lease also provided that if a majority in amount of the bondholders should, within ninety days from the date of the lease, unite in giving notice in writing to the lessees, of their desire to terminate the lease at the expiration of one year from its date, then the lease should so terminate and be valid only as a lease for one year. The lessees went into immediate possession of the road, and within ninety days from the date of the lease, a committee, representing the holders of a majority of the bonds, gave them notice that they denied the powers of the trustees

to make the lease, and that they repudiated the same, and held the lessees as trespassers in the use of the road. The lessees, however, still retained possession of the road, and in May, 1857, the orators, who held bonds to the amount of one hundred and twenty-one thousand dollars, brought a bill in chancery against the trustees and the lessees, in behalf of themselves and all other bondholders, who should come in and assist in the prosecution of the bill, setting up the greater part of the foregoing facts, and praying for a decree that after the foreclosure the trustees had no right to make any disposition of the road except to convey it to the bondholders, and that the lease to the Troy and Boston Railroad Company was null and void, etc. But the court decided otherwise,—BARRETT, J., dissenting,—and ordered the bill to be dismissed; and *Held :*

1. That the trust conferred upon the trustees by the mortgage was after the breach of condition, and before foreclosure, not a *dry, naked trust,* but entirely an *active and fiduciary one ;* that they could not then have surrendered the trust to the *cestuis que trust,* and that they were not in any condition to obtain counsel from them.

2. That the foreclosure of the mortgage did not materially change the nature of the trust, and that it still necessarily continued their duty to control and manage the road, as trustees, for the benefit of the *cestuis que trust,* in such a manner as a prudent and experienced owner would adopt under all the circumstances, taking into account the nature of the property, the public demands upon those who should operate the road, and the duty of securing the greatest permanent return to the *cestuis que trust ;* and that this duty of management and control would continue until they were discharged by the court of chancery, or by the *unanimous* and *legally binding* consent of the *cestuis que trust,* or until the latter acquired some legal organization and a capacity to act through a majority.

3. That as the trustees could not consult the entire body of the *cestuis que trust,* and as their duty was due to the bondholders severally, they were not at liberty to follow the advice or wishes of the majority, being still liable to the minority for a faithful administration of their trust.

4. That as they had no rolling stock and equipment, and no means of purchasing any, they could not be required to attempt to operate the road on their own account, except as a matter of strict necessity and practicability; that they would naturally elect between hiring their equipment, on the one hand, and, on the other, leasing the road to a company owning a connecting line; that the loss resulting from their short experiment, just made, in the former course naturally and properly led them to lease their road as they did, and that such disposition of it was reasonable and prudent, and the rent reserved advantageous.

5. That the provision in the lease in regard to repairs, imported that the road was to be *kept* in good running condition at the expense of the lessees, during the term, and to be returned to the lessors in that condition; and that

this provision secured to the lessors all that could be asked or desired in that respect.

6. That the length of the term, ten years, with the condition of defeasance, at the end of one year, by notice to that effect, from a majority in amount, of the bondholders, was not unreasonable. But if the lease contained no provision, whereby it could have been terminated by the legal agency of the *cestuis que trust* in some short but reasonable period, at the beginning of the term of the lease, it would wear a very different aspect, and might have been regarded as somewhat more questionable, so far as the power of the trustees is concerned.

7. That as the bill was brought before the expiration of the first year of the term, the question, as to the effect of the notice from the majority of the bondholders to the lessees upon the lease after the first year, was not before the court.

8. That, inasmuch as the statute of this state enabled those having control of railroads in Vermont to lease them to other companies owning roads connecting with them at the line of the State, the orators could not object to the want of authority in the Troy and Boston Railroad Company, by virtue of their charter, to take the lease, so long as the State of New York, and those interested in that company, had taken no measures to interfere with or avoid the lease.

9. That the lease could not be avoided on the part of the lessors, or those they represented, on the ground of any informality in its terms or unreasonableness in its provisions, unless a case were shown of want of power, that the contract is *ultra vires*.

All trusts depend much upon the implications growing out of the state of the property, the purposes desired to be accomplished, and the mode provided for that end. This is true, to a great extent, of all contracts. It is only by means of the constructive additions and limitations imposed by courts, that a brief memorandum of a contract is ever made to speak truly and fully the mind of the parties. REDFIELD, Ch. J.

But upon no subject is there so much demand for the exercise of construction, and of judicial implications, as in regard to trusts; and especially trusts of the complicated and public character of the one under consideration in this case. And these implications and constructive additions are not less a part of the contract than its most express provisions. REDFIELD, Ch. J.

All corporate action, as well that of the directors and agents, as of the corporation itself, is but a succession of trusts, in regard to which the creditors of the corporation, in the order of their priority, are the primary, and the shareholders the ultimate *cestuis que trust*. REDFIELD, Ch. J.

It is well settled, that trustees are not to be removed from part of their trust,

leaving them burthened with and responsible for the remainder; nor will such a trust be discharged until fully performed, or the *cestuis que trust* are in a condition to manage it themselves. REDFIELD, Ch. J.

APPEAL from the decree of the court of chancery. The bill was brought on the 4th of April, 1857, and set forth that the Western Vermont Railroad Company, owning a railroad extending from Bennington to Rutland, and being authorized by law to issue and secure its notes or bonds, for the purpose of paying its debts, issued its bonds to the amount of four hundred thousand dollars on the 10th day of January, 1851, payable to Shepherd Knapp, or bearer, in four installments of one hundred thousand dollars each, payable in five, ten, fifteen and twenty years, respectively, from January 1st, 1851, in the city of New York, with seven per cent. interest per annum, payable semiannually; that a portion of said bonds were for five hundred dollars and the remainder for one thousand dollars each; that their payment was secured by a mortgage of the road and franchise of said company, executed by it to the defendants Knapp and Briggs, and the survivor of them, and the appointee of such survivor, as trustees, (this mortgage was described in the bill, and was in the usual form of a deed, with a condition that it should be void in case the said bonds and the interest thereon were paid at maturity; and it contained no provision in reference to foreclosure of the mortgage, nor the possession or sale of the road by the mortgagees, nor as to the rights or duties of the trustees in the event of a foreclosure); that the orators, at the date of the bill were the owners and holders of said bonds to the amount of one hundred and twenty-one thousand dollars of principal, besides a large accumulation of interest thereon; that in 1854, a default having been made by said company, in the payment of certain interest then due upon said bonds, the defendants Knapp and Briggs brought a bill in equity, in the court of chancery for Bennington county, praying for a foreclosure of said mortgage, which on the 4th day of July, 1855, resulted in a decree of that court that the defendants in that suit should pay to the said Knapp and Briggs, or their successors in said trust, and for the use and benefit of the holders of said bonds, certain

sums therein mentioned, being the amount then due and afterwards to become due upon said bonds, on or before certain times therein specified, and in default of such payments that the defendants in such suit should be forever foreclosed from all right in the said mortgaged property and franchises, and that the said Knapp and Briggs, trustees, and their successors in said trust, should have the possession, use and enjoyment of said franchise to themselves, their successors and assigns, in trust for the use and benefit of the holders and owners of said bonds, as they might be respectively entitled, forever free and clear of all equity of redemption ; that the defendants in this foreclosure suit failed to make a certain payment of one hundred and fourteen thousand dollars, provided for by the decree, and becoming due on the 1st day of January, 1857, and that thereby, under the decree, the mortgage to Knapp and Briggs became absolute, and all equity of redemption of the defendants in the foreclosure suit was foreclosed, and the legal title to the mortgaged property became vested in Knapp and Briggs in trust for the use of the bondholders in the proportion of their respective claims thereto ; *and that the estate held by Knapp and Briggs, under this decree, conferred upon them no other right than to hold the naked title thereof for their cestuis que trust, and to convey the same to them, or such persons as they might for the purpose designate ;* that Knapp and Briggs, having obtained the legal title of the mortgaged property, without the authority of the orators and their other *cestuis que trust,* and against their will, on the 16th day of January, 1857, leased to the defendant, the Troy and Boston Railroad Company, an association existing in the state of New York, but not a corporation existing under the laws of Vermont, the said railroad, with all its privileges and appurtenances for ten years from that date, by an indenture, of which the following is a copy :

" THIS INDENTURE, executed the 16th day of January, 1857, between Shepherd Knapp and George Briggs, Trustees of the first mortgage on the Western Vermont Railroad, in the state of Vermont, on the one part, and the Troy and Boston Rail Road Company on the other part, witnesseth : That the said Trustees hereby lease and demise to said Company, for the period of ten

years from and including this date, subject to the conditions here-inafter expressed, the said Western Vermont Rail Road, as located and heretofore occupied under the charter of the Western Vermont Rail Road Company, with all the buildings, priviliges and appurtenances thereto belonging, and the full right to hold, use and operate the same in conformity with said charter, together with all the tools, implements, and furniture belonging to said Trustees, and now on or about said road, and used for operating or repairing the same.

And the said Company hereby covenant and agree with the said Trustees to pay them, as rent for said road and property, the sum of twenty-five hundred dollars per month for the first year of said lease, and the sum of three thousand dollars per month during all the succeeding years thereof, in the manner following:—The rent for that portion of the month of January, 1857, included in said lease, and rent for the month of February, 1857, to be paid on the first day of February, 1857, and the rent for every succeeding month during the continuance of this lease, to be paid in advance, on the first day of the month.

And it is hereby mutually agreed, that in case of failure on the part of said Company to make any of said monthly payments of rent to said Trustees, within ten days after the same becomes due as aforesaid, then said Trustees shall have the right forthwith to terminate this lease, and to reënter upon and take and retain possession of said road and property without legal process.

And the said Company further covenant and agree with said Trustees to return said road and property, both real and personal, at the termination of this lease, in as good condition and repair in all respects as it now is in, natural wear only excepted.

And it is agreed that Charles Linsley, of Rutland, Vermont, and either one of the present Railroad Commissioners of the state of New York (provided his attendance shall upon reasonable application, be procured by said Company,) shall pass over and examine said road and property as soon hereafter as the state of the weather and the season render it practicable, and make an examination as to the condition and state of repairs of the same.

And that, upon the termination of this lease from any cause, the same parties, or the survivor of them, if either of them is

living, and where his attendance can be obtained, shall make a like examination, for the purpose of ascertaining whether said road and property are in the condition and state of repair required by this agreement, and if not to appraise the difference in value. The decision so made to be final between said Company and said Trustees.

And it is hereby further understood and agreed, that this lease is made subject to the following conditions : — That if a majority in amount of the bondholders under said first mortgage upon said road, shall within ninety days from the date thereof, unite in giving a notice in writing to said Company of their desire to terminate this lease at the expiration of one year from the date hereof, the said lease shall so terminate, and shall stand valid between the parties only as a lease for one year from the date hereof, subject, however, to the other provisions of this indenture.

And it is hereby further agreed, that nothing herein contained shall be construed as creating any personal liability whatever on the part of the said Trustees or of the directors of said Company, either for a failure, from whatever cause, in the performance of any of the stipulations of this indenture, express or implied, or from any other matter or thing arising from or in consequence of this indenture, in any manner whatever.

In testimony whereof said parties have hereunto affixed their names and seals.             (Signed,)

SHEPHERD KNAPP, } Trustees.
GEORGE BRIGGS,

Sealed and delivered in the presence of
    JOHN J. LATTING,
    ISAAC V. BAKER.

The Troy and Boston Railroad Company, by D. Thos. Vail, their President, duly authorized by said Company to execute this indenture in their behalf, and to affix the corporate seal thereto.

(Signed,)             D. THOS. VAIL,
    President Troy and Boston R. R. Co.

Sealed and delivered in the presence of
    N. FORSYTH,
    GEO. GOULD.

That the Troy and Boston Railroad Company was, prior to the execution of this lease, fully informed of all the facts herein before stated, and of the rights of the orators and the other bondholders; that on the 9th of January, 1857, and before the execution of the lease, the holders of said bonds to a large amount requested the defendants Knapp and Briggs to make no disposition of the railroad until after a meeting of the bondholders should be held, and informed them that they were unwilling that the road should be leased to the Troy and Boston Railroad Company; that they understood that company to be irresponsible, and in any event an improper company to have the road, and that they wished the trustees to convene a meeting of the bondholders to ascertain their views in regard to the disposition of the road; that in the ordinary use of a railroad in general, and of this one in particular, the same constantly deteriorates, and that it is necessary constantly to make repairs and renovations of its superstructure, rails, viaducts, and a great variety of necessary and expensive structures, and that by the ordinary wear and use of such road during a period of ten years without constant and expensive reparations, most of its superstructures, rails, viaducts and structures would become nearly or quite worthless and unfit for use, and that the value of the railroad and its appurtenances would be diminished to an amount greater than the full amount of the rent reserved by the lease during the whole term thereof; that Knapp and Briggs placed the Troy and Boston Railroad Company in possession of the railroad and its appurtenances, and that that company had since the date of the lease been in the possession and use thereof, and that both Knapp and Briggs, and that company claim and insist that the lease is good and valid and that the Troy and Boston Railroad Company are rightfully in possession of the railroad by virtue thereof; that the orators and other persons holding bonds amounting to more than two hundred and fifty thousand dollars did subsequently to the execution of the lease, and prior to the bringing of this bill, cause notices to be given to Knapp and Briggs and the Troy and Boston Railroad Company, to the effect that they should insist that Knapp and Briggs had no power or right to make such lease, or

any lease or disposition of the railroad in question, except a transfer thereof to the *cestuis que trust* or such persons as they might designate, and that such lease was absolutely void and that they repudiated and disaffirmed the same; that the following is a copy of such notice given to the Troy and Boston Railroad Company, and that it was delivered to them in March, 1857; viz:

*To the Troy and Boston Railroad Company:*

The subscribers, a committee appointed by, and representing persons and firms constituting a majority in interest of the *cestuis que trust* interested in the railroad and property mortgaged by the Western Vermont Railroad Company, to secure bonds issued pursuant to resolutions of the said company, of January 7th, 1851, under and by virtue of the said foreclosure of the said mortgage, hereby inform you that they have heard that Shepherd Knapp and George Briggs, the trustees named in the said mortgage, have executed a lease of the said railroad and property to you, by an instrument dated January 16th, 1857.

They further inform you that the said Shepherd Knapp and George Briggs had no power or right to make such lease or any lease or disposition of the said railroad and property, except a transfer to the *cestuis que trust*, or to such persons as they might designate, and that such lease and disposition is absolutely illegal, null and void, and that they repudiate and disaffirm the same, and will hold you as trespassers and responsible for all injuries or loss they may sustain, in consequence of your using the said railroad.　　　JONATHAN STURGES,

　　　　　　　　JAMES L. STARK, JR.,

　　　　　　　　THOMAS DOUGLASS,

　　　　　　　　　　　*Committee for Bond Holders.*

The bill further set forth that the railroad and franchise in question could be made to produce a revenue greatly exceeding the rent reserved by the lease above described, after disbursing from its earnings all the money necessary to keep it in good repair.

The bill prayed for a decree that the defendants Knapp and Briggs, by virtue of said mortgage and decree, held the road and franchise only in trust for the use and benefit of the orators and

the other bondholders, and that they had no power, right or authority to sell, lease or transfer the same except to their *cestuis que trust*, or to such persons as they should designate for that purpose, and that the lease to the Troy and Boston Railroad Company was absolutely unauthorized, null and void; that the Troy and Boston Railroad Company acquired no right thereby to retain their possession of the railroad and franchises, and that their possession thereof was in violation of the rights of the orators and the other *cestuis que trust*, and that the defendants account for all the use of the railroad by the Troy and Boston Railroad Company, and for any injury or deterioration thereof.

The bill also contained a prayer for general relief, and also for an injunction upon all the defendants against using, possessing, controlling or intermeddling with the railroad or franchise, and from selling or delivering them, until the further order of the court, to any person except a receiver to be appointed by the court of chancery, and that such a receiver might be appointed, with proper power and under proper instruction, to take possession and charge of the said railroad and franchises during the pendency of this suit; and also that the defendants Knapp and Briggs, might be compelled to convey the railroad and franchises held by them, as trustees, to the *cestuis que trust* entitled thereto, to be ascertained by the court of chancery, and that if necessary, a disposition might be made thereof, and of their several rights, as in case of partition, so that each of said *cestuis que trust* might enjoy his interest therein in severalty.

The bill professed to be brought for the orators, not only in their own behalf, but also in that of all other bondholders who should come in and contribute to the expenses of the bill and its prosecution.

The answer to the defendants Briggs and Knapp, after admitting a portion of the introductory part of the bill, proceeded as follows:

" And these defendants, further answering, admit, that the estate and interest in said franchise and property, which passed to them under said decree of foreclosures was in trust for said bondholders, and deny that they have ever for a moment supposed

or asserted otherwise. And they utterly deny that the only right or power therein acquired and possessed by them, under said mortgage and decree, was to hold the title thereof, or to convey the same to such party as might be designated by said bondholders, as claimed in said bill; and they aver, that said property, so passed to them under said decree, consisted only of said franchise, the easement or right of way for the exercise thereof, and which would be forfeited on ceasing to be exercised, and the superstructure and appurtenances of said road. That said franchise and easement was a grant from the state, in which the public retained a large interest, and the right of general control, and if mortgaged to trustees by authority of law must continue to be held by such trustees in the event of foreclosure, until other provision should be made by law, for the security and benefit of the public, as well as of the creditors interested therein. And that the trustees would not be authorized to convey the same until authority was given by law, either to such secured creditors, or to any person whom such creditors might designate.

And these defendants further say, that at the time of said foreclosure said bondholders were numerous, and were scattered throughout several states. That among them were married women, infants, and others under legal disabilities. That it was impossible for these defendants to ascertain fully who they were, or to communicate with them. That no organization existed among them, or any provision of law under which they might organize, or were enabled to act through any common medium or head. That no claim was made to these defendants by any bondholders that said property should be conveyed to them, or to any person by them designated, nor was any suggestion of such conveyance made from any quarter, nor could any such claim be properly made, if at all, except by the whole body of the bondholders, to these defendants. And that even if so claimed any such conveyance would have been both illegal and impossible.

And these defendants further answering say, that previous to the said road passing into their hands under said foreclosure, the same had been run and operated for the two years and three months next preceding, by one Myron Clark, who was in occu-

pation of the same as lessee of said Western Vermont Railroad Company at the time of the commencement of said foreclosure suit. That upon motion by these defendants at the commencement of said suit, said Shepherd Knapp was, by order of the chancellor, appointed a receiver therein, and said Clark was authorized to continue in possession as lessee, filing monthly accounts with said receiver and the court of the earnings and expenditures of said road, and paying over to the receiver monthly the net earning thereof. That in pursuance of such order, said road had been occupied and run by said Clark, up to the time that it passed to these defendants under the operation of said decree as aforesaid, and was in his possession at the time said decree expired, though his lease thereof was terminated some months previously. That the forfeiture of said road under said decree was entirely unexpected to these defendants, as they had been informed from reliable sources, and believed, up to the last day limited for the payment, that said installment would be paid as the preceding one had been. That upon the forfeiture taking place, immediate action on the part of these defendants as trustees, became necessary. That it thereupon became necessary to adopt one of four courses with said road and property. To stop the running thereof entirely, and to shut up the same until such time as the bondholders could obtain an act of incorporation and organize, which in no event could take place in less than one year from that time. Or to run and operate said road themselves as trustees. Or to leave the same in the hands of said Clark to operate as theretofore, as their agent, accounting for the proceeds. Or to let said road temporarily to some responsible and proper party, who would run the same so as to discharge the duty to the public imposed by the charter, keep it in suitable repair, and pay to the bondholders a reasonable return for the earnings thereof. That these defendants were advised by their counsel, and in the exercise of their best judgment fully believed, that to stop the running of said road, and to shut up the same, would have not only deprived the bondholders of all income therefrom, but would have been ruinous to the property, a breach of the duty imposed by the charter, and would seriously have endangered the forfeit-

ure of said franchise. Nor did any bondholder desire or suggest the closing of the road. That to run said road themselves as trustees, was absolutely out of their power, inasmuch as they had no furniture nor rolling stock of any description, nor any means to procure the same. Nor were they bound to assume any such responsibility, nor did any bondholder desire or suggest that they should do so. That to place said road in said Clark's hands, to run as agent of said trustees, was, in the judgment of these defendants, most objectionable for many reasons, inasmuch, as the returns for the earnings of said road had been always obtained from said Clark with great difficulty and delay, and these defendants then claimed and believed, and now claim and believe, that said Clark had never fairly or justly accounted for the earnings of the road, but had improperly and illegally retained large sums thereof, in respect of which these defendants, as trustees, are now in litigation with said Clark in this court, he claiming over eight thousand dollars to be due him from said trustees, and these defendants claiming a large balance to the contrary. Whereby the income of said road, while in the possession of said Clark, had always been much below what it ought to produce. Nor did any bondholder whatever, except said Clark and his attorney James L. Stark, as hereinafter stated, express to these defendants a desire that said road should remain in said Clark's hands, but said bondholders, as far as they expressed any opinion to these defendants, desired that said road should not remain in his hands, but that proceedings should be instituted against him by these defendants for a settlement of his accounts, and the recovery of the sum justly due from him thereon. And finally, if as claimed by the orators, these defendants had not the power to let said road for the purpose of running the same, in a manner and upon terms that would be advantageous to the bondholders, much less had they a right to enter into a contract with said Clark for running the same, under circumstances which justified them in believing that not a dollar of income would thereby be realized.

And these defendants further say, that they admit that shortly before the expiration of said decree they were requested by said Clark, who was anxious to retain the possession of the said road,

to call a meeting of the bondholders. And they say that they had no knowledge who the bondholders were, except as to a limited amount, nor where nor how they could be communicated with ; and were satisfied that an attempt to call a meeting of bondholders would only result in present delay and expense, and finally in bringing together very few, except certain parties in the city of New York, whose interests, as hereinafter more fully stated, were adverse to those of the majority of the *bona fide* holders. And regarding it as a matter purely in their discretion, and not rendered incumbent upon them by any provision of said mortgage or the decree thereon, or by any rule or practice of law, and believing it could result in no good and perhaps in harm, they declined to call such a meeting at the request of said Clark.

And these defendants further say, that on the 2d day of January, 1857, and as soon as they had ascertained that said road had passed under said decree, they addressed to said Clark a letter requesting him to continue to run the road as before, for a short time, and until definite arrangements could be made, inviting proposals from him if he desired to lease the road at a stipulated and secured rent, and apprising him that the road could not remain in his hands upon the terms on which he had previously run it, after other arrangements could be made. That said Clark did, in pursuance of such request, continue to operate the road from the first to the fifteenth of January, bringing the trustees in debt therefor, according to his account subsequently rendered, in the sum of two thousand eight hundred and twenty-eight dollars and thirty-one cents, being the excess, as he alleges, of expenditures over earnings for said fifteen days. That these defendants having thus made temporary arrangements for running said road, immediately employed themselves in ascertaining to whom and upon what terms said road could be entrusted for operation, with a view to accommodating the public, preserving the property, and obtaining the best and surest return to bondholders, and in informing themselves meanwhile so far as possible, in regard to the wishes of bondholders on the subject. That for this purpose they caused personal application to be made to many bondholders both in New York and Vermont, being those whom

they had reason to suppose were the most largely interested, for an expression of their wishes and opinions as to the disposition of said road. That among others, application was made at their instance to the orator, Thomas Douglass, informing him that some arrangement must immediately be made for operating the road, that these defendants did not feel justified in continuing the former arrangements, and requesting an expression from him or from any of his friends interested in said bonds, of their views as to the proper course to be taken. That to this request the said Douglass declined to make any reply, and neither questioned the power of the trustees to act in the premises, nor objected to their acting in the manner proposed. That a similar application was made, with a similar result, to Messrs. Raymond and Fullerton, of New York, who held said bonds to the amount of eighty-eight thousand dollars. That similar application was also made to nearly every holder of bonds to any amount, of whom these defendants had any knowledge. Though neither the orators, or said Clark, or any of the parties acting in concert with them, did, either at that time or since, until the filing of this bill, inform these defendants who were the holders of said bonds, or in what amount, or give them any information whatever on the subject; but have uniformly concealed their knowledge on this point from these defendants. That a number of the bondholders expressed themselves to these defendants as in favor of the lease made by them as hereinafter stated. And that no bondholder whatever expressed himself to these defendants as opposed to the making of said lease, excepting the said Clark ; nor had these defendants any reason to believe that any portion of said bondholders were opposed to the making of said lease, except the said Clark and those connected with him, as hereinafter stated, in the running of said road, and the profits derived therefrom, at the expense of the other parties interested in said bonds. And these defendants did not regard themselves as justified in sacrificing the interests of the bondholders, to the private objects of those who desired to retain a profitable possession of said road.

And these defendants admit, that between the first and sixteenth of January, 1857, the said Myron Clark, the said James

Sturges and Douglass *v.* Knapp et als.

L. Stark, one Ira Cochrane, and Henry Root, called on said Shepherd Knapp, at the city of New York, in reference to the disposition to be made of said road; that said Clark then owned, as these defendants believe, but a small amount, if any, of said bonds; said Stark and said Cochrane owned none, and said Root was a member of the firm of Graves & Root, who owned about five thousand dollars thereof; that neither of the orators, though both were then in the city of New York, were present at said meeting, nor was any other bondholder, except as above stated; that on being called on to express the object of their visit, and desired to state what course they proposed to these defendants to pursue in regard to said road, said Stark, after some hesitation, stated that they thought said road had better be left in said Clark's hands for the present, and that ultimately a meeting of bondholders might be called. To this the said Knapp replied, that the trustees did not feel justified in leaving said road in said Clark's hands longer than would be necessary for the making of other arrangements and should decline so to do, and stated the reasons, as hereinbefore set forth, why an attempt to call a meeting of the bondholders would result in no benefit; and that, if desirable arrangements for running the road for the ensuing season were to be made at all, there was no time to lose. And further saying, that all suggestions from any bondholders, in regard to the parties to whom said road should be entrusted, or the terms, conditions, or security to be exacted, would be cheerfully received and weighed by the trustees, who merely desired to discharge their duty in the premises, and to take the best course for the interests of all concerned. Whereupon said meeting separated, said Clark expressing himself violently opposed to any lease to said Troy and Boston Railroad Company, but said Root and Stark stating immediately afterwards to the counsel of these defendants, as they are informed and believe, that they should be satisfied with a lease to said company, if a sufficient rent could be obtained, and its payment properly secured. And these defendants deny that any other call was ever made upon them by any deputation of bondholders, in reference to this subject, or in opposition to the leasing of said road.

And these defendants admit, that having ascertained that they could obtain better terms for the running of said road from the Troy and Boston Railroad Company, than from any other party, they did execute to and with said company the lease or contract set forth in the orators' bill, the original of which contract they bring into court and refer to, and caused the same to be, in all respects, legally executed by both parties, and duly recorded.

And these defendants say, that said lease was entered into by them in entire good faith, without any personal benefit or advantage, or expectation thereof, to them or either of them, in the full belief, formed after much consideration, that it was a judicious and desirable contract for the said bondholders in all respects, and the best that could under the circumstances be obtained, and believing and being advised that they had full power and authority to enter into it.  That several of the bondholders, and among them a party representing all or nearly all the Vermont bondholders were present at the time said contract was concluded, and advised and approved of the same.  That these defendants fully believed that said lease would meet the approval of the majority of the bondholders, and of all, save those who had been connected with said Clark in the running of said road, and who desired that the same should be continued in his hands, for reasons of their own, and who then, as these defendants believe, constituted but a small minority.  And these defendants believed and were advised, that they were bound to act for the true interests of all the bondholders both large and small, whatever private interests even a majority of them might have to the contrary.

And these defendants further say, that the rent agreed to be paid, under said lease is a fair and reasonable compensation for the use of said road, and all that they were able by any exertion to obtain from any party ; and is more, as they believe, than any other party than a connecting road could afford or be induced to pay, especially if the said lease terminates at the expiration of one year.  And they deny that said road could be leased to any responsible parties for any higher rent.

And these defendants say, that the rent stipulated to be paid, and thus far received, under said lease, is greatly more than has

been realized from said road by the bondholders during the twenty-seven months it has been run for their benefit through the agency of said Clark, according to his accounts, either upon an average of the whole time, or of any part of the time, except a period of about twelve months, during which time the Rutland and Washington road, parallel to this road, was closed, and the business of this road, in consequence, during that period nearly doubled. That the average amount of net receipts during the whole period of said Clark's management, was twenty-five thousand and three dollars and fifty-two cents per year. And the average amount of such receipts for said period, exclusive of the time when said Rutland and Washington railroad was closed as aforesaid, was eight thousand and sixty dollars and forty-four cents per year.

. And these defendants further say, that the provision contained in said lease, in regard to repairs, is regarded by these defendants as fully protecting the interests of bondholders, inasmuch as the repairs required must be made from day to day, constantly and uniformly, in order to ensure the safety of the trains passing over the road. And unless such repairs are made and kept up, great loss must necessarily be sustained by parties running the road. So that the best security that such repairs will be made, is found in the fact that the interests of said company imperatively require them. And in regard to the clause of said lease requiring the return of said road in as good condition and repair as when received by said company, "natural wear only excepted," these defendants contend and are advised that the true and just construction of said clause is to exempt said company only from such natural wear as must occur, notwithstanding the making of usual and reasonable repairs; that no "*wear*" can be regarded as *natural* upon a railroad, which occurs by the neglect of the parties running the same to keep up such repairs; that the whole context of said lease requires this construction, and that the terms were and are so understood by both parties, as well as by all railroad men. And they deny that said road has deteriorated, or is in danger of deteriorating under said lease for want of proper and suitable repairs.

. And these defendants further say, that said Troy and Boston

company have been in possession of said road, under said contract, since the 16th day of January, 1857. That they have paid to these defendants the stipulated rent for said period, monthly, in advance, in cash, including the present month. That as these defendants are informed and believe, the said company have kept said road in good and sufficient repair, have run their trains so as to accommodate the public, and have in all respects complied with the conditions of said lease. That they purchased of these defendants, and paid therefor by acceptance, due May 19, 1857, all the wood, oil and waste on hand, at the time said Clark relinquished said road, and which was the property of said trust. That they have made, as these defendants are informed and believe, important and expensive arrangements in view of the continuation of said lease for at least one year, and have run the road and paid the rent during that portion of the season, when the net proceeds were probably less than the rent.

And these defendants further say, that during the period in which said Clark run said road as aforesaid, the rolling stock and furniture with which the same was operated was the property of the said Clark and the orators, who charged, and received during the whole of said time for the use thereof, as nearly as these defendants can ascertain, about thirty-three per cent. annually, upon the true cost thereof, to them, which sum was deducted and retained by said Clark from the earnings of said road. That during the same time, said furniture and rolling stock was kept in such a state of repair and renewal at the expense of said trust and out of said earnings, that the same was more valuable at the expiration of said period and could be sold for more than when the same was purchased by said owners thereof. That the sum thus reserved for the rent of said personal property during said period of twenty-seven months, was forty-two thousand eight hundred and forty-six dollars and ninety-eight cents. And the amount expended for the repair thereof in the same time was about thirty-two thousand dollars. The entire cost of said rolling stock and furniture being, as these defendants are informed and believe, not exceeding the sum of seventy thousand dollars, and being probably considerably less.

And these defendants further say, that as they are informed

Sturges and Douglass *v.* Knapp et als.

and believe, immediately after the execution of said lease, said Clark, acting for himself and as the agent of the orators, applied to said Troy and Boston company, to purchase said rolling stock and furniture, asking a large price therefor, and assuring them that the bondholders would acquiesce in said lease, and were satisfied with it, and that no attempt would be made to disturb it from any quarter, provided they purchased said property. That said company declined to purchase said property at the large price asked therefor. That thereupon, as these defendants are informed and believe, said Clark and the orators immediately employed themselves in purchasing up said bonds, and endeavoring to obtain the control thereof, and to influence bondholders by many incorrect statements in regard to said lease, and the conditions and result thereof, and as to the conduct and good faith of these defendants, and have succeeded in purchasing or getting control of a considerable amount of bonds not owned by them at the time said lease was executed, and in influencing some of the bondholders to change their views in regard to said lease.

And these defendants believe and aver, that the orators and said Clark are actuated in bringing this suit and in raising objections to said lease that were not raised at the time of its execution, nor afterwards until as above stated, and in endeavoring to excite and prejudice the bondholders on this subject, by a desire to dispose of said furniture, or else by the hope of again getting possession of said road, for the purpose of obtaining the extravagant rent for said property heretofore received by them, and thus absorbing the earnings. And that, could they succeed in so obtaining control of said road, none of the other holders of bonds not acting in concert with them would ever receive any return from the earnings, or be able to dispose of their bonds unless at a very great sacrifice.

And these defendants say, that they have made no effort to influence bondholders on the subject in any way, not conceiving themselves called upon to do so in any other manner, than by furnishing to all who called on them, every information in their power.

And these defendants admit, that the orators and said Stark,

styling themselves a " committee of bondholders," have caused written notice to be given to these defendants and to said Troy and Boston Railroad Company, of the character stated in said bill, which notices were served less than ninety days from the execution of said lease, and were to the effect that the bondholders represented by said orators and Stark, being a majority in amount, repudiated and disaffirmed said lease. But said orators and Stark never did nor would inform these defendants what bond-holders they represented, or to what amount, for what purpose or under what authority, nor ever produce to these defendants any evidence whatever of their right to represent any bondholders for any purpose. And these defendants are therefore entirely ignorant whether they were so authorized or not. But upon their best information and belief, they deny that they are legally authorized to represent any such number or amount of bondholders as is stated in said bill, either in giving said notices or in prosecuting this suit. And whether said notices so given operate in law to terminate said lease at the expiration of the first year thereof, these defendants submit to the judgment of the court, annexing a copy thereof to this answer for reference.

And, upon all the facts hereinbefore stated, these defendants insist :

1. That they, as trustees, had full power and authority fairly to be implied from the terms of their trust, and necessarily arising from the nature and situation thereof, to enter into said contract or lease, at all events for the term of one year, and with the approbation of the bondholders, for a longer period. That said Troy and Boston Railroad had likewise full power on their part to make and carry out said contract. That the same was executed by both parties in good faith and in all respects legally. And that said company having entered into possession, and incurred large expense in pursuance thereof, can not be divested of their said possession, or deprived of the benefit of said contract.

2. That said power was exercised by these defendants in entering into said contract, not only in good faith and with an honest purpose, but prudently, judiciously, and with due regard to the

rights and interests of the bondholders. That the rent stipulated for thereby is fair and sufficient, and the provisions contained therein on the subject of the repairs, preservation and return of the property, adequate to protect all the just rights of the owners thereof, in that respect. And that said contract at the time of the execution thereof was in fact approved by said bondholders so far as their opinion could be obtained, and is now attacked by parties who have mainly obtained the ownership and control of bonds, since the making of said contract, for the purpose of attacking the same.

3. But that if this were otherwise, and the provisions of said lease were ever so improvident and unsatisfactory on the part of the trustees, the rights of said Troy and Boston Railroad Company fairly and legally acquired under the same can not be affected thereby, nor can they on that ground be divested of their possession or their contract either by present injunction or final decree.

4. That the title derived under said lease being in dispute, and said company having entered into possession in good faith, and under regular conveyance from those having the legal title, they can not be ejected upon interlocutory injunction, based upon motion and affidavit, no such power existing in this court whatever may be the opinion of the court as to the title. Especially as no danger of irreparable loss or injury pending this suit is shown, and no necessity whatever for such summary and severe exercise of the authority of the court; but, on the other hand, it is made to appear that said road is in safe custody, is likely to be kept in sufficient repair and preservation, and is paying a reasonable and adequate rent, well secured, to the bondholders, the said company being also fully responsible for any further compensation or damages that may be decreed by the court in this suit or otherwise recovered. Any apparent equity to the contrary in said bill in any of these respects, being hereinbefore fully denied. That to divest the possession of said company by injunction, at this time, and before the termination of the first year of said lease, must necessarily result in great loss to the bondholders, notwithstanding the best disposition that could be made of the property,

and would result in still greater and irreparable loss to said company, should their title ultimately be sustained, and might probably expose said property to a heavy claim for damages, in behalf of said Troy and Boston company.

5. That there is no power in the court to appoint a receiver to operate a railroad, or exercise a franchise, nor would such receiver be able to run said road, if appointed, for want of rolling stock or furniture, or money to purchase the same. And if able to run the same, he could not in any event realize from said property during the present year, for the benefit of the bondholders, so much as will be received under said lease. That no necessity or propriety for appointing a receiver, other than the one already appointed, is shown, inasmuch as neither the character or responsibility of these defendants is questioned, nor is it pretended that they have ever misapplied a dollar of the funds of said trust, or propose so to do, or claim any right to the same, except for the benefit of bondholders, under the direction of this court. All the money received by these defendants, as they aver, being forthwith deposited separately, in the Mechanics' Bank of the city of New York, where the same is perfectly safe, and is drawing interest, subject at all times to the direction of this court, and to a proper distribution among the bondholders.

6. That the conveyance of said property by the trustees to the bondholders, and the partition thereof among them, sought for in said bill, is wholly unauthorized by law, and without the power of this court. That said property must necessarily remain in the hands of trustees for the benefit of those interested and of the public, until such time as proper provision by law is made in the premises, which, as these defendants are advised and believe, may be accomplished at the next session of the legislature of this state.

And these defendants pray that said motion for injunction and receiver may be denied, and said bill of complaint be dismissed with costs."

The answer of the Troy and Boston Railroad Company, in addition to various allegations and denials substantially the same as those made in the answer of Knapp and Briggs, contained also the following clauses:

Sturges and Douglass *v.* Knapp et als.

" And this defendant further answering says, that at the time of the making the indenture aforesaid, between Shepherd Knapp and George Briggs, of the one part and the Troy and Boston Railroad Company of the other part, to wit, on the 16th day of January, A. D., 1857, the said Troy and Boston Railroad Company were a corporation created by, and existing under the laws of the state of New York, and long previous thereto had been such corporation, and not a mere association as is untruly alleged in said bill of complaint, as will more fully and at large appear, by the original articles of association of the said Troy and Boston Railroad Company, ready in court to be shown, a copy of which is hereunto annexed, as also, by the statute laws of the state of New York.

And this defendant, the Troy and Boston Railroad Company, as such corporation, had full power and authority to lease the said Western Vermont Railroad, and to make and enter into the indenture of lease herein set out.

And this defendant avers that the said Troy and Boston Railroad Company are good and responsible, and have always in good faith fulfilled their contracts, and discharged their liabilities, except when they deemed and supposed they had a valid and legal defence.

And this defendant denies that the said Troy and Boston Railroad Company are an improper company to have the said Western Vermont Railroad, as is untruly alleged in complainant's said bill, but on the contrary, this defendant says that said roads can be run and operated under one direction at less expense and more beneficially to those interested in and owning said road, as well as affording better accommodations to the public, than if said roads were run under the direction of two independent superintendents and boards of directors.

And this defendant further answering, says that after the execution and delivery of the indenture aforesaid on the 16th day of January 1857, this defendant did enter into the possession and enjoyment of the said Western Vermont Railroad and other property therein mentioned, and has ever since and still continue to run and operate said Western Vermont Railroad under said lease

in a prudent, careful and husbandlike manner, and paying monthly in advance the rent therein stipulated to be paid by this defendant, and doing and performing all the other covenants and stipulations contained in said indenture, to be done and performed on their part and behalf. And this defendant further says that from time to time, as was necessary, and the weather and season permit, this defendant has kept said Western Vermont Railroad in good running order and repair, and for that purpose have employed a road master of experience and skill, and placed under his charge a suitable number of workmen to make said repairs; and also have purchased ties, and re-rolled twenty tons of iron, which is now being used to repair said railroad; and this defendant further says that the said Troy and Boston Railroad Company have purchased one engine or locomotive and contracted for the purchase and delivery of two passenger cars and twenty-five platform cars at an expense of twenty thousand dollars, also have purchased two thousand cords of wood, delivered and to be delivered, on the line of said Western Vermont Railroad at a cost of two dollars and twenty-five cents a cord, of which about fifteen hundred cords are now on hand, to enable this defendant to run and operate said railroad and to accommodate the business and travel during the continuance of said lease; and this defendant further says, that from the 16th day of January, 1857, to the first day of April, a period of about two and one half months, this defendant has lost about the sum of eight thousand dollars, in running and operating said railroad under said lease; and this defendant further says, that during the time aforesaid a bridge on the line of said railroad, in the town of Clarendon, was carried away by flood, and immediately thereafter this defendant erected trussle work across said stream for the passage of trains, and intends to re-build said bridge at their own cost and charge, if undisturbed in the possession and enjoyment of said road under the said indenture.

And this defendant further answering, says that he admits that in the ordinary use of a railroad, and of the railroad aforesaid, the same is constantly deteriorated, and that it is necessary to make repairs from time to time, and renovations of its superstruc-

Sturges and Douglass v. Knapp et als.

ture, rails, viaducts, and a great variety of necessary and expensive structures ; and this defendant also admits, that by the ordinary wear of such road during the period of ten years, without constant and expensive renovations and reparations of most of its superstructure, rails, viaducts and expensive structures, it would become nearly and quite unfit for use.   But this defendant denies that the said Troy and Boston Railroad Company can run and operate said Western Vermont Railroad without daily, monthly and yearly, and every year during the continuance of said lease, repairing and renovating its superstructure, rails, viaducts and other expensive structures, and that such repairs are absolutely necessary to be made from time to time in order to supply and properly run and operate said Western Vermont Railroad ; and this defendant further says, that after such repairs have been made from time to time as aforesaid, the ordinary wear and tear of said railroad during the continuance of said lease would amount to a small and inconsiderable sum; and not, as is untruly alleged in said orators' bill of complaint, exceed in amount the rent paid by this defendant, during the term of said lease.

And this defendant further answering says, that when they took possession of said Western Vermont Railroad, a large number of new cross-ties were required for said road, and that they have now contracted, and are now contracting for such a number of cross-ties as will be amply sufficient for the coming season. And they further say and aver, that when they so took possession of said road, they found the iron rails on said road badly worn, and requiring renewals and large repairs, and that since the spring opened, they have furnished about twenty tons of new iron, and that they intend during the coming season, to make such renewals of cross-ties, and iron, and repair of iron, as will make the track of said Western Vermont Railroad amply safe and sufficient, and in good repair.

And this defendant further answering says, that it denies that a railroad, or the Western Vermont Railroad, can be run and operated until it shall become worthless as the orators pretend.  And this defendant says and avers that no person or party,

who may hereafter operate the said Western Vermont Railroad, can ever with safety, allow it to be more out of repair than it was when taken possession of by these defendants; and these defendants further aver and say, that after the cross-ties and iron on a railroad begin to fail, there must then be large renewals and repairs yearly until the whole of the iron and cross-ties have been renewed, and that within about eight years the whole of the iron and cross-ties will have been renewed, and that the repairs afterwards will be about the same, extraordinary storms and accidents excepted; and these defendants deny that they ever intended, or now intend, to use and run said Western Vermont Railroad until the same shall have become worthless, but aver that they intend to put and keep the same in good and thorough repair for their own safety and interest, and that of the public, if they shall be allowed to possess and occupy said railroad under their said lease herein referred to. And these defendants wholly deny that they have, or intend to commit any waste, destruction or spoil of said Western Vermont Railroad, superstructures, or other lease-hold property.

And this defendant further says that the said Troy & Boston Railroad Company are purchasers in good faith, for a valuable consideration from said trustees of the said road, franchise, and other property, mentioned and described in said indenture without any knowledge, notice or information that the cestuis que trust or either of them had objected to the leasing of said property to this defendant, or had made such request or given such notice as in the said complainant's said bill are mentioned, and this defendant does therefore claim and insist that the said Troy & Boston Railroad Company are entitled to hold said leasehold property freed and discharged of and from any legal or equitable lien or claim of the said complainants or any other bond holder or cestuis que trust, to restrain or enjoin this defendant, the Troy & Boston Railroad Company, from running and operating said Western Vermont Railroad, or from enjoying the use and possession thereof during the continuance of said lease.

And this defendant further says that the said Troy & Boston Railroad Company entered into the possession and use of the said

Western Vermont Railroad, under said lease from its date, and that said indenture of lease is a valid, binding and operative contract, made for a valuable consideration, the payment of a just and fair rent, monthly in advance to said trustees; and this defendant denies that the said Troy & Boston Railroad are trespassers in running and operating said Western Vermont Railroad under said indenture; and this defendant also denies that the said Shepherd Knapp and George Briggs, by virtue of said mortgage and decree of foreclosure only acquired a naked legal estate in the said railroad and its franchises, real estate, structures and other property for the use of the *cestuis que trust*, and as such trustees they had no power to sell, lease or dispose of the same, but by direction of your orators and other *cestuis que trust*, and that the instrument aforesaid executed by them leasing the same to the Troy and Boston Railroad Company, was, and is, unauthorized and void, as is untruly charged and alleged in said bill, but on the contrary this defendant is advised by his counsel and does claim and insist, that the trustees aforesaid had under and by virtue of the decree of foreclosure the legal estate in said mortgage property, and having the legal estate, the said trustees could rightfully sell or lease said railroad and its franchises and other property, with, or without the assent or concurrence of the complainants or the other *cestuis que trust* in said bill mentioned, and thereby convey the legal title to said railroad and its franchise, real estate and other property to the purchaser, if the purchaser is ignorant of the trust, but if the purchaser is not ignorant of the trust, he holds the legal title to said mortgage property incumbered with the trust and may be held to account as a trustee in a court of equity.

And this defendant further answering says that he is advised by his counsel and therefore insists, that if any such notice was given or request made of said trustees by the complainants and other bond holders as is alleged in the said complainants said bill, (but which this defendant does not admit,) prior to or at the time of making said lease, said trustees might lawfully disregard such notice and refuse to comply with such request inasmuch as the trust created under and by virtue of said mortgage deed, was

not a public but a private trust; and in order to compel a conveyance of said trust property to said *cestuis que trust*, or legally to control the action of said trustees, in respect to said trust property, the assent, direction, and concurrence, of all the *cestuis que trust*, or bondholders, should have been obtained, as is by law required, and notice thereof given to said trustees.

And this defendant further answering, says that the trust created by said supposed mortgage deed from the Western Vermont Railroad Company to said Shepherd Knapp and George Briggs, was a *personal active* and *continuing* trust, and until an act of the legislature was passed to enable the *cestuis que trust* to organize as a corporation, it was the duty of said trustees to hold, possess and use said trust property, and make the same productive to said *cestuis que trust*, and for that purpose lease said railroad to be run and operated at a fair and reasonable rent."

It further appeared from their answer that the Troy and Boston Railroad Company owned a railroad, which connected with the Western Vermont Railroad near the town of Bennington, running from thence to Troy. They also set up in their answer an agreement between them and the Western Vermont Railroad Company, made November 29, 1850, which, they claimed, amounted to a lease of a portion of the railroad and franchise embraced in the mortgage to Briggs and Knapp, as trustees, and which being prior to that mortgage and as they claimed, being known to Knapp and Briggs at the time of the execution of the mortgage, they contended took precedence of the mortgage and was not affected by the foreclosure thereof; and upon this point a great amount of testimony was taken by both parties, but as this point is not alluded to by the court in their opinion, and is entirely immaterial to the questions actually decided, the allegations of the answer, and the testimony in regard thereto, as well as such portions of the briefs of the several counsel as relate to this subject, are omitted.

After the answers were filed, a hearing was had before the chancellor, Hon. Wm. C. Kittridge, upon the question of granting the injunction prayed for by the bill, which resulted in granting the injunction and the appointment of a receiver to run the road during the pendency of the suit.

Sturges and Douglass *v.* Knapp et als.

The orators subsequently filed a general replication to each of the answers, after which the respective counsel entered into the following stipulation:

1. "The cause is to be heard upon bill and answer, as modified by the facts herein agreed upon; so far as regards all the ques-. tions arising in the cause, excepting as to the claim of the Troy and Boston Railroad Company, arising under the agreement of November 29, 1850, made between the Troy and Boston Railroad Company; and the acts of the two companies, and of Myron Clark, lessee, in relation thereto. Upon these questions testimony is to be read, and form part of the papers of the appellate court. The replications, so far as inconsistent with the provisions of this stipulation, to be deemed withdrawn, or modified.

2. The following facts are to be deemed admitted: Prior to, and at the commencement of this action, the plaintiffs held the bonds of the Western Vermont Railroad as stated in the bill of complaint.

Prior to the making of the lease to the Troy and Boston Railroad Company, mentioned in the pleadings, certain persons claiming to represent bondholders, called upon the defendant Knapp, on behalf of themselves and other bondholders, and requested them not to lease the road until the views of the bondholders be ascertained, at a meeting to be called for the purpose; among the bonds so represented were those owned by the plaintiffs. In that interview the number of bonds represented was not stated, nor their particular ownership.

Knapp informed the persons present that the trustees would listen to suggestions of bondholders; but as they were trustees for the whole, they should not necessarily be controlled in their action by a majority in amount of the bonds; that they should use their discretion to act for the interests of the whole.

The plaintiffs were never specially asked, by Knapp and Briggs, who were the owners of the bonds whom they and Mr. Stark represented, as a committee of bondholders; and the plaintiffs never declined, or refused to inform them whom they represented, nor gave them any particular notice as to who were the bondholders whom they so represented.

At the time of the notice to the Troy and Boston Railroad Company, the committee giving such notice represented the holders of a majority of the bonds.

Any accounting which, by the decision of the appellate court, may become necessary, is to be referred to a master to hear and state accounts upon, and report to the court for confirmation."

The chancellor, without any further hearing, rendered a *pro forma* decree for the orators, from which the defendants appealed.

The cause was argued at the stated term of the supreme court for Bennington county in February, 1858, and was, by direction of the court, continued to this term for re-argument.

*William Tracy*, for the orators.

1. In the claim arising under the lease from Knapp and Briggs, the Troy and Boston Railroad Company are privies and are estopped by everything which estops Knapp and Briggs.

They are thus estopped to deny the validity of the mortgages under which the foreclosure was had, and that Knapp and Briggs by the foreclosure took precisely the title which the decree confirmed to them.

The questions presented on this branch of the claim affect only the title Knapp and Briggs acquired by the mortgage and the foreclosure, and their power to dispose of it.

2. The estate which Knapp and Briggs obtained by the foreclosure was a *dry trust* for the benefit of the bondholders.

The mortgage was a deed to them of all the legal estate conveyed, as trustees for the bondholders, subject to a condition defeating the estate if the payments were made. If the condition be struck from the deed, it was a deed to the trustees *for the use* of the *cestuis*, which the statute of uses would have executed immediately to the *cestuis*.

Trusts are declared now to be what *uses* were before the statute of 27 Hen. 8; the right (in the cestui to receive the profits of land and dispose of it in equity, to hold and dispose of it at his pleasure. Bac. Ab., Uses and Trusts, (vol. 5, 386, orig. ed.)

A *use* was a right which he, who conveyed to another a legal estate, reserved upon trust that the grantee would permit him to

take the rents and profits and that the trustee should execute estates according to his direction. Bac. Ab., Uses and Trusts, (vol. 5, 338); Hill on Trustees 316 ; Ib. 471, 478, as to power to sell; Ib. 480, as to power to lease.

The forum where it is adjudged, is the only difference between trusts and legal estates. 1 W. Bl. 160 per Ld. Mansfield, in *Burgess* v. *Wheate.* " The trustee is merely an instrument of conveyance; Ib. p. 162. " His duty is to hold for the benefit of all who would have been entitled if the limitation had not been by way of trust ;" Ib. p. 162. " The declaration of trust is the disposition of the land ;" Ib. p. 162.

By the foreclosure the condition was cut off, and the estate granted was confirmed in Knapp and Briggs as trustees to the same extent that they would originally have held it without the the condition.

3. The estate vested in Knapp and Briggs by the decree, gave them no new powers which were not expressed in the original mortgages. No power was given them to lease or to sell; they had no function but to hold the title, and to defend that for their *cestuis*, and to convey as they were by the *cestuis* directed; Hill on Trustees p. 316, above cited; Ib. p. 253. " Where a *cestui que trust* becomes absolutely entitled to the whole beneficial interest in the trust estate, it is clearly the duty of the trustee, when so required by the beneficial owner, to convey the legal estate to him or according to his direction." Ib. p. 272 : " Where the legal estate is vested in a person as a dry trustee for the person who is entitled to the absolute beneficial interest, we have already seen that it is the duty of the trustee to dispose of and convey it according to the direction of the *cestui que trust*."

4. In the absence of a statute executing uses to possession the defendants Knapp and Briggs after the foreclosure occupied the position of the feoffees to the use of the bondholds. The bondholders were the *cestuis que use.* The properties of a use are defined (Ld. Bacon, Reading on Stat. Uses 10) : — 1. That the feoffee will suffer the feoffor *(cestui)* to take the profits [*to take them himself*— not that the trustee collect them and pay over]. 2. That the feoffee, upon *request* of the feoffor, *or notice of his will*, will execute the estate to the feoffor, or any other by his direc-

4

tion. 3. That if the feoffor be disturbed, the feoffee will reobtain his possession. Vol. 1 Cruise Dig. p. 362; 1 Sanders' Uses 1. 1 Cruise Dig. 488 (4): "With respect to the law of trustees, it is still held, in conformity to the old law of uses, that *pernancy of the profits, execution of estates,* and *defense of the land,* are the three great properties of a trust; so that chancery will compel trustees: 1. To permit the *cestui que trust* to receive the rents and profits of the land; 2. To execute such conveyance as the *cestui* shall direct, and 3. to defend the title of 'the land in a court of law or equity." *Id.* 489 (5): * * * "But when the *cestui que trust* has the absolute interest in the trust, he can compel the trustee to convey the legal estate to himself or to any other person in fee simple." 2° Story's Eq. Jur. secs. 968, 977, 978, 979.

The bondholders, and they alone, were at any time beneficially interested in the mortgaged premises under its provisions. The trustees were merely " *the instruments of conveyance,*" (1 W. Bl. 162, above), the *conduit* through which the title was to pass from the mortgagor. No active executory trust was committed to them; they were not to sell the railroad to pay the bonds nor to lease it, nor to do anything with it, not implied in the naked fact that they were trustees.

5. The lease to the Troy and Boston Railroad Company being unauthorized, it was absolutely void, and the company could take no estate or right under it. 1. It was unauthorized. The powers of a trustee of an express trust must be found in the instrument constituting him a trustee, and there was no such power expressed in the mortgage. 2. The Troy and Boston Railroad Company had notice of their power, and want of power of the trustees under the mortgage. The lease recited the title of the trustees by reference to the mortgage. 3. The lease was given against the wishes of the bondholders. 4. The lease was a most improvident one. 5. The Troy and Boston Company had no power to receive it under their charter.

6. The trustees, Knapp and Briggs, having, in violation of their trusts, leased the railroad to the Troy and Boston Railroad Company, which took it with notice of their want of power, both trustees and the Troy and Boston Railroad Company are wrong-

doers, and the decree should compel them both to account to the plaintiffs.

*E. J. Phelps*, for the defendants, Knapp and Briggs.

1. It is a cardinal rule in the construction of trusts, that all powers in relation to the subject matter, necessary to carry out the object, if not expressly given or withheld, are to be regarded as implied.

In these, as in all other contracts, the intent of the parties will control.   To effect this intent, the instrument will be liberally and beneficially construed.   It will be considered in connection with the nature of its subject, the situation of the parties, the surrounding circumstances, and the object in view.   The parties will be presumed to have contemplated all natural results, and to have intended to convey the necessary powers to meet them.   *McCulloch* v. *Maryland*, 4 Wheaton, 316 ; 4 Kent's Com., 319, 346 ; Sugden on Powers, 92 ; Hill on Trustees 342 and notes ; *Jackson* v. *Veeder*, 11 Johns. 169 ; *Osgood* v. *Franklin*, 2 Johns. Ch. 1 ; *Wilson* v. *Troup*, 7 *ib.* 25, and 2 Cow. 195 ; *Hedges* v. *Riker*, 6 *ib.* 163 ; *Schermerhorn* v. *Schermerhorn*, *ib.* 70 ; *Mills* v. *Catlin*, 22 Vt. 98 ; *French* v. *Carhart*, 1 Comstock 96 ; *Lowry* v. *Adams*, 22 Vt. 160.   Thus even an estate in the trustees, will arise by implication, where necessary to effect the object.   *Cooksen* v. *Lee*, 23 Eng. Law and Eq. 400 ; *Brewster* v. *Stryker*, 2 Comstock 19.   Or a power to sell the trust property.   *Spalding* v. *Shalmer*, 1 Vernon 301.

2. Applying this rule to the facts of the present case, it will be seen that the power of the trustees to operate the road, after their title became absolute under the decree, is a necessary implication, and must have been intended by the parties.

*The road must be run.*   The trust property consisted only of the franchise of the corporation, and their easement in the land which the road occupied.   The only possible mode in which it could be made to effect the object of the trust, the payment of the semi-annual interest, and ultimately the principal of the bonds, was by the operation of the road as authorized by the charter.   If this was suspended, not only would the trust cease to answer the purpose, and rapidly diminish in intrinsic value, but the very

franchise would finally be forfeited, and the land would revert to its original owners. Redfield on Railways 124–603.

*It could not be run by the bondholders as tenants in common.* They were numerous and widely scattered, under various legal disabilities, and changing daily, as well by the frequent negotiation of the bonds, as by the new relations constantly arising in the ordinary course of events. They could not be brought together, and, if together, possessed no means of organization or action, and no right of majority control. They constituted only a vast unwieldy, and irresponsible partnership, unable to act except by unanimous consent, and many of them legally incapable of giving consent. Nor was there any legal authority for the exercise of this franchise by such a body, thus independent of the corporation, and without charter of their own. *State* v. *B. C. and M. R. R. Co.* 25 Vt. 442. And finally, it was not then, nor is it now, claimed by the orators, or, by any other party, that the road could be operated in this manner.

*Nor could it be run by the court of chancery.* It would be absurd to give a mortgage a construction, which would necessarily result, upon foreclosure, in a perpetual receivership. The same reason that would require a receivership at all, would require its indefinite continuance. No change in the position of the parties could possibly occur, except by the incorporation of bondholders. Future legislation is not to be anticipated in the construction of a contract, especially as such legislation, if had, could not change the rights of the parties, nor without their consent convert a tenancy in common into a corporate joint stock property.

If a contract requiring such a receivership were made, the court would have neither the inclination nor the power to become a party to it. A receivership is always a temporary remedy, arising from unforseen contingency or misconduct. There is no instance where the court will adopt the execution of a perpetual trust. If a contract were susceptible of no construction which would provide other means for its execution, it would be held void, as impossible to be performed.

*The road must therefore be run, if at all, by the trustees,* the chosen agents of all the parties, invested with the title by express

decree, recognized by law, and fully under control of the court.

To this result no objection can be made. It answers every requirement of the trust, protects all rights, and is the rational and obvious answer to the question, what was the intent of the parties ?

The very claim made by the orators and their associates, when the title first vested in the trustees, is consistent with this view. They did not propose that the operation of the road should be suspended, nor that the bondholders in person should undertake it. They claimed that the trustees should continue the running of the road by their agent, (as they had done for fifteen days,) till the wishes of the bondholders should be ascertained ; and, of course, till these wishes should become entirely harmonious.

3. The same power now in question has been asserted without objection, under similar provisions, by the mortgage trustees of every railroad in Vermont, and has been repeatedly recognized by the courts. The estate of such trustees, and their power to take under their mortgage, possession of the road, is the same, in legal contemplation, after condition broken, as after foreclosure. If the view taken by the ex-chancellor in this case is correct, the possession of all these roads for the last six years has been entirely without legal authority. *Shaw et al. trustees* v. *Norfolk Co. R. Co.*, 5 Gray 162 ; *Hall et al.* v. *Sullivan R. Co., U. S. Circuit Court in New Hampshire,* — opinion of CURTIS, J., not reported, — Redfield on Railways 575 and notes.

4. No analogy exists between this case and the *dry trusts* of the English law. Those arise where neither the terms nor the intent of the conveyance, require anything more from the trustee, than the mere holding of the title. In such case, it is not claimed that the trustee has any other power. This is in its nature, and by necessary intendment, an *active trust*, and must be construed and administered accordingly.

The subject of this trust also, differs widely from the case of real estate, held as individual property. It is a franchise, in which the state retains a large interest, and the right of general control. It cannot be held without use, and cannot be used without authority of law. In England a conveyance of such a franchise is held impracticable, and for this reason. Redfield on Railways 572 et inf.

Trusts of this description are of a very recent origin.  They can not be controllod by precedent.  They must be governed by the broad and general principles of the law, judiciously applied to the new exigency that has arisen.  *McCulloch* v. *Maryland,* above cited.

5.  If the trustees had the power to run the road at all, they might properly do it by judicious contract, such as the statute authorizes for that purpose, with a connecting line.  The lease is in its effect nothing more than this.  It is legal in its character, sufficient in its provisions, and, (except by consent of the bondholders,) covers no longer a period than was necessary and prudent.  They were not bound to run the road in person, and were well justified in adopting this course.

The lease is not attacked upon any other ground than the want of the power of the trustees to operate the road.  If that power exists, the propriety of this mode of exercising it can hardly be questioned.  *Clement* v. *Canfield,* 28 Vt. 302.

6.  The power of the Troy and Boston Company to take this lease is not open to question.  *State* v. *The B. C. and M. Railroad Co.,* 25 Vt. 440 ; *Bank of U. S.* v. *Primrose,* 13 Pet. 519 ; *R. and B. Railroad Co.* v. *Proctor,* 29 Vt.  And if it were, both parties were estopped by their lease from denying it.  Nor is it alleged that the company have interposed this ·objection, to any of the requirements of their agreement, but the contrary expressly appears.

7.  If the lease is held valid, the accounting prayed for by the orators will be denied.  The receipts and disbursements of the trustees, since the decree became absolute, will be a part of their general account, and be settled with it in the usual way.  The present bill is not adapted to such a settlement, and does not claim it.

And even if the lease were held invalid, the results of it, so far as in the hands of the trustees, would pass into their general account, and be settled in a proceeding to which all the bondholders would be parties.

Such an accounting has already been had, before a master, by a regular order of the court of chancery, since the filing of the answer in this case, and the report now awaits confirmation by the court.  If it becomes material that this fact should appear on the record leave should be given to file a supplemental answer.

8. The partition prayed for in the bill, is not within the power of the court, and if it were, could not be decreed in this suit.

9. Costs should be allowed to the trustees.

*John S. Robinson* and *Charles Linsley,* for the defendant, the Troy and Boston Railroad Company.

To sustain this bill, it is said in Hill on Trustees 279, that : " The *cestui que trust* must have an *immediate* and absolute equitable interest in the trust estate ; otherwise he will not be entitled to require a conveyance of the legal estate from the trustees." *Cateret* v. *Cateret,* 2 P. Wms. 134. The *cestui que trust* must have that *immediate right to the possession of the property which,* if it had been a legal right, would enable them to sustain an action at law for the possession. The orators have recognized that principle in their bill. It is the specific case which they have made, that the lease of 1857 should be declared null and void, and the trustees then be decreed to convey the trust property to them. It is not pretended in the bill that such a decree can be made if that lease is valid ; as during the term therein mentioned the *cestuis que trust* have no immediate equitable interest in the trust estate.

Three objections are taken to the validity of that lease :

1. *That the Troy and Boston Company* had no authority under that charter to take the lease, or obligate themselves to perform the stipulations contained in it.

2. *That the trustees of the Western Vermont Railroad Company,* had no authority to execute the lease, and that it is void for that reason.

3. *That the lease was improvidently executed,* contrary to the will and against the interest of the *cestui que trust.*

1. Had the Troy and Boston Company authority to take the lease and obligate themselves to perform its stipulations ; or was the obligation on their part *ultra vires* ?

*a.* This objection cannot arise in the case. It is not made in the bill. 20 Vt. 632 ; 15 Vt. 110 ; Mitford 40.

*b.* But if that averment had been made, the objection is unavailable. The Troy and Boston Railroad Company are authorized, by their charter, not only to construct their road, but " to

connect with some railroad extending from Fitchburg westerly, so as to make a continuous road from Troy to Boston." A connection is formed, not simply *by running to another road*, but by some agreement between different roads, whereby they are placed under mutual obligations to form a continuous line. The acceptance of this lease formed such connection with the Western Vermont Railroad; and in so doing, they exercised no powers not given by their charter; and in performing its stipulations, there is no misappropriation of their corporate funds.

*c.* The Troy and Boston Company, in executing this lease violated no law of this state. The statute expressly authorizes a lease of this character to any other railroad in or out of this state. Comp. Stat. 204, sec. 66; Redfield on Railways 478; 1 Railway Cas. 135. Moreover, as neither the stockholders of the company nor the state granting the charter have interfered in this matter, third persons who have no interest in it will not be permitted to make the objection. *Rut. and Bur. Railroad Company* v. *Proctor et al.*, 29 Vt. 93; *Silver Lake Bank* v. *North*, 14 John. Ch. 317.

*d.* The statute of New York authorized the Troy and Boston Company to execute this lease. 1 New York Revised Statutes 772, section 5.

2. Had the trustees of the Western Vermont Railroad Company authority to execute this lease?

Ordinarily the duties of trustees and their power in the disposition of the trust property depend upon the instrument creating the trust estate. Where specified duties are enjoined, and express powers are given, those duties and those powers are substantially if not strictly to be pursued. The deed in this case, while it creates an express trust, specifies no duties to be performed by the trustees, nor are any express powers conferred on them for any purpose; neither is there any *limitation of their powers* in the deed. In such case their duties and their powers are to be determined by law. They are such as the law creates and implies, and which are necessary to enable the trustees to do whatever shall advance the interest of the *cestuis que trust*. In this respect their powers and duties are correlative. Whatever duties the trustees are required to perform, the law will imply such powers

as are necessary to discharge them.   2 Spence's Eq. J. 367; *Cookson* v. *Lee*, 23 English L. and Eq. R. 400.   Even in cases where express powers are given, implied powers will also arise, when necessary to promote the interest and benefit of the *cestuis que trust*.   In 2 Story's Eq. J. sec. 978, it is said : " That the powers which may be properly exercised over trust property by a trustee depend upon the *nature of the trust*, and sometimes upon the *character and situation of the cestui que trust.*"   In Hill on Trustees 429, it is said : " That the *position* and *capacity* of the *cestui que trust* will constitute another ingredient for consideration in determining the nature and extent of the authority of the trustees.   Where the estate is held in trust for *feme coverts* or *infants*, who are incapable of acting for themselves, the power of management and control must necessarily devolve on the trustees for their protection and benefit."   5 Mad. 433.   Those facts are to be considered in this case, for it is distinctly stated in the answer of the trustees, that some of these *cestuis que trust* are *feme coverts*, *infants*, and *others* under *other legal disabilities*, and as this case, so far as the lease of 1857 is involved, stands on bill and answer, these facts are admitted to be true.

It is averred in the bill : " *That the estate held by the trustees conferred upon them no other rights than to hold the naked title for the cestuis que trust, and to convey the same to them, or such persons as they might designate ; and that this was known to the Troy and Boston Company when this lease was executed.*"   That is the only objection stated in the bill to the want of power in the trustees to execute the lease ; no other objections, therefore, can be made or urged on the trial of this case.   If that was the *nature of the trust*, and the trustees had no other duties to perform but to transfer the title as stated in the bill, then this lease would be held subject to that equity ; *as a transfer of that title would, under those circumstances, determine the trust, and would of itself discharge the trustees from any future liability in the subsequent management of the trust estate.*   That is regarded as a conclusive test, whether the trustees held an *active* or *dry trust*.

It is obvious, that was *not the nature of the trust before foreclosure ;* nor did the trustees then hold the legal title for that purpose.   Comp. Stat. 286, sec. 12.

After forfeiture by non-payment of the money as it fell due on the mortgage, the trustees held not only the legal title, but at common law and by statute, they had the right to its exclusive possession. They were the mortgagées of the estate, and held the legal title in trust for the mortgagors as well as the bond-holders. As such mortgagees they were charged with active duties, for which it was necessary for them to have and keep the legal title. The right of exclusive possession is given to them, that by the use of the property, it may be rendered productive and available for the payment of the mortgage debt. Hill on Trustees 429 ; 19 Vt. 322 ; 2 Story's Eq. J. sec 1016 ; 2 Spence's Eq. J. 920 ; Hill on Trustees 281 ; 1 J. and Walk. 68 ; 4 Kent's Com. 168.

The foreclosure of the mortgage did not convert that *active trust* into a *dry trust*, or render it the duty of the trustee to convey the legal estate to the *cestuis qué trust.*

After foreclosure of the mortgage the trustees were no longer mortgagees in trust. They were not answerable to the mortgagors for the rents and income of the property ; that relation was cut off by the foreclosure ; but the *nature of the trust*, and the *char- 'acter* and *situation of the cestuis que trust or bondholders* remained the same. Instead of a defeasible estate they had an absolute estate in fee under an express trust ; the same as if the estate had been conveyed to them by absolute deed with trust declared. The trustees being invested with the legal title in fee to this trust estate, *and there being no express restriction of their powers*, it was obviously their duty to make some disposition of it, and in a manner which would best promote the interest and benefit of each and all the *cestuis que trust.* That obligation on the trustees arose from their assuming the trust ; and those duties are to be performed in the exercise of that diligence, which a provident owner would exercise over his own property. 2 Story's Eq. J. section 1268.

That the trustees, by the foreclosure, were not seized of a *dormant estate* or *dry trust*, and that it was not their duty to convey the trust estate to the *cestuis que trust* is obvious from the following considerations.

*a.* Such a conveyance *would not have determined their trust nor*

*would it have discharged the trustees from their future liability in the management of the trust estate by their grantees.* If the *cestuis que trust* had all been *sui juris*, and all *had requested a transfer of the legal estate*, ordinarily, such a conveyance would have been a good execution of the trust, *as the trustees would thereby have been discharged from any future liability for any act of their grantees.* But as they were not all *sui juris*, the trustees could not have made a transfer of the legal estate to them or any appointee, without committing a breach of trust. The trustees would have continued liable for any breaches of trust committed by their grantees to all who were not *sui juris*, after their disabilities were removed. This consideration is regarded as conclusive against considering the trustees as having a *dormant estate* or *dry trust*; Hill on Trustees 579; Lacy Exparte, 6 Vesey 627; *ib.* 778, note 1.

*b.* Neither were the trustees bound to convey to those of the *cestuis que trust*, who were *sui juris*, that part or proportion of the trust property which equitably belonged to them, retaining at the same time in their own hands as trustees that part of the estate which belonged to those who were not *sui juris*. They will be required to convey the trust estate only when they can be divested altogether of the trust, and be relieved from all future liability as trustees. Hill on Trustees 429; *Goodson* v. *Elliason*, 3 Russ. 594.

*c.* But if the *cestuis que trust* had all been *sui juris*, it would not have been the duty of the trustees to have conveyed the estate to them, as no request for such a conveyance had been made previous to the execution of the lease to the Troy and Boston Company.

*d.* A conveyance to the *cestuis que trust*, though some of them were under legal disabilities, could have been made under an order of the chancellor ; *as such order would protect the trustees from any future liability in the management of the property.* But no such order would be made, until a reference to the master had been had to ascertain who were the *cestuis que trust*, and *settle the form of conveyance ;* and in no case will such order be made, when it will affect any adverse interest which may have been created by the trustees in the execution of their trust. Hill on Trustees

281 ; 2 Daniels Ch. P. 900.   If this lease was lawfully executed at the time it was given, it will bind the *cestuis que trust* during the term, and equity will protect their title against any claim subsequently made by the trustees or *cestuis que trust.*

*e.* If, for the reasons above stated, no conveyance of the trust property could be made by the trustees to the *cestuis que trust* at the time the lease was executed to the Troy and Boston Company, the objections to that lease, so far as they are stated in the bill are fully answered ; as the trustees were not seized of a *dry trust,* rendering it their duty, and only their duty, to convey the property to the *cestuis que trust.   No other objection to the want of power in the trustees to execute this lease is stated in the bill.*

As no conveyance of the trust property could have been made by the trustees to the *cestuis que trust,* at the time the lease was executed, so as to determine their trust duties, and be discharged from their liability as trustees, the inquiry still remains, what were the powers and duties of the trustees over the trust property at the time the lease of 1857 was executed to the Troy and Boston Company.

*a.* The general principles are well settled : Where special instructions are given in the instrument creating the trust, or special duties are imposed, those duties are to be performed and those powers are to be, at least, substantially pursued ; " but where no special instructions are given, a trustee is bound to employ the trust property for the benefit of the *cestuis que trust* with the care and diligence of a provident owner ; and so far is this rule extended, that however fully a discretionary power of management may have been given, yet if the trustee omit doing what would be plainly beneficial, he will be answerable."   2 Story's Eq. J. sec. 1276 ; Willis on Trustees 125, 127 ; 1 Hov. on Frauds 486 ; Hill on Trustees 482 ; *Newcomb* v. *Kittleta,* 19 Barbour 608 ; *Hedges* v. *Riker,* 5 John. Ch. 163 ; 4 Cruise Dig. 75, 84.

*b.* The trustees having the legal title to the road and its franchises, they were bound to use it themselves and pay to the *cestuis que trust* the net proceeds, or get some one else to use the property and pay the rent.   If they used it, they would be personally liable, in the first instance, for any and all damages how-

ever occasioned. If the property was insufficient to indemnify them, the loss would be sustained by them personally. That liability the trustees were not bound to incur. The only course that could be taken by the trustees in the discharge of their duties was to lease the property, and thereby render it productive for the use of the *cestuis que trust.* If, under such circumstances, it was their duty to use or lease the property, it was also their duty to defend the title, to protect the property from injury and waste, to collect the rents and income of the property, and execute legal discharges and releases for it, to ascertain the persons entitled to it and pay the same to them in their respective proportions ; and, in short to discharge all those duties which are imposed on ordinary trustees having the legal estate and the management of trust property of this character for the benefit of those who are not *sui juris* as well as those who are of legal capacity.

Such a trust, requiring the performance of active duties is not, under the English law, within the statute of uses. The possession would not be annexed to the use. It is a trust estate at common law, unaffected by the statute, and the remedy of the *cestuis que trust* is only in equity. 11 Vt. 45 ; 2 Black. Com. 335, note ; 1 Spences Eq. J. 464.

*c.* The fact that the Troy and Boston Company had notice at the time the lease of 1857 was executed, that the property was held in trust, has no importance in the case. The question of notice is important only, *when the conveyance of the trust estate was made in a breach of trust.* 16 Vt. 413 ; 2 Story's Eq. J. sec. 977 ; 27 E. Com. Law 769. *There was no breach of trust in executing that lease.* It was their duty to execute this lease, as they were not authorized to convey the property to the *cestuis que trust.* In no other way but by this lease, could the property be made available to those who were beneficially interested. Notice of the existence of the trust, under such circumstances is unimportant.

3. The lease was not improvidently executed by the trustees, nor was it executed contrary to the will and interest of the *cestuis que trust.*

*a.* The responsibility of the Troy and Boston Company and their ability to perform the stipulation in the lease is not now dis-

puted. That the rent was paid, the road properly managed and kept in repair while it was in their hands, is distinctly stated in the answers of both defendants, and as this case, on this lease, stands on bill and answer, those facts are fully proved.

*b.* The lease was a beneficial arrangement for the *cestuis que trust.* It secured as rent thirty thousand dollars for the first year, and thirty-six thousand dollars for each succeeding year, equal to about nine per cent. on their investment. The trustees state that that amount could not be obtained by any other arrangement; neither was it then pretended by any of the parties interested, that a better arrangement could be made as to the amount of rent.

From January 1 to January 15, 1857, being fifteen days, the road was run by Mr. Clark at the request of the trustees. In that time the *ceustis que trust* were charged the entire income of the road and two thousand eight hundred and twenty-eight dollars and thirty-one cents, as excess of expenditure over its income. It is obvious such use of the road rendered valueless the interest and property of the *cestuis que trust,* and gives the reason why most of those, who were then interested in the road, were anxious not only for a settlement with Mr. Clark, but that this lease should be made to the Troy and Boston Company.

The Troy and Boston Company could better assume to pay the stipulated rent, in consequence of the increased travel upon their road, which this road would enable them to procure, and from the consideration also, that the expenses, to which they were chargeable in running their own road, would to a great extent operate the Western Vermont road. The road could be made profitable in their hands, while it would be unprofitable when in the hands of another company.

*c.* The term of ten years was a reasonable period for the duration of the lease. It would be unreasonable to require a company to assume the control and operation of a road of that length, to make certain and permanent arrangements for its operation for public and private use, and to incur the increased expenditure required for that purpose, for a less period of time. If the road had been leased from year to year, those permanent improvements, which the safe and profitable use of the road requires, could not

be made with any certainty of their enjoyment. The risk of the entire loss of all expenditures on the road, and of accidents which would prevent them from using it during most if not the whole term of the lease, would fall exclusively upon the lessees. The period for which the lease was given is but a reasonable compensation for the risk assumed.

In any event it is no cause for vacating the lease. Where the term of the lease is limited in the power to a specified period, and the lease is given for a longer time, the lease is good in equity for the specified time, and void for the excess only. At law the doctrine may be otherwise, but that is the settled rule in equity. But where, as in this case, the length of time is not limited, " the trustees must be guided by the consideration of what is most beneficial to the trust estate." Hill on Trustees 481, 482 ; 1 R. and Milne 501 ; 19 Barbour 608. *In equity they must act precisely as if the estate was given to them in trust to let.* Leases for that period have never been deemed unreasonable. So far as this lease is concerned it may be said in truth, that the longer the term of the lease, the more the interests of the *cestuis que trust* are advanced, and the greater becomes the market value of the property.

But if the lease was originally executed without proper authority, still the lease should be sustained, as it was subsequently ratified and affirmed by those, who, by this bill, seek to avoid it. " *They cannot claim or insist on opposite and repugnant rights.*" 2 Story's Eq, J. sec. 1262–3 ; 2 John. Chan. 441.

The *cestuis que trust* have received eight thousand seven hundred dollars from the Troy and Boston Company as rent under this lease, and in taking possession of the road, have the use of a large amount expended in repairs. *The acceptance of the rent is an affirmance of the lease.* In now asking the property to be conveyed to them, it is the same as receiving the purchase money and then claiming the property sold.

It is unjust and inequitable also, that the orators should permit the road to be run by the Troy and Boston Company during a season of the year when but little traveling ordinarily exists, and when it was run at a loss of about eight thousand dollars, and as soon as the profitable season arrived to take the road from their possession by the commencement of this suit.

The right of the Troy and Boston Company, under the lease of 1857, was not affected by any notice of the *cestuis que trust*, that the lease should terminate at the expiration of one year.

The notice which was given does not profess to make such termination. It was obviously intended only as a repudiation of the act of the trustees in making the lease originally to the Troy and Boston Company.

If, however, this lease of 1857 is regarded as inoperative for the purposes for which it was made, equity will not permit the *cestuis que trust*, to avoid it, and decree a conveyance of the trust property to them, without paying the Troy and Boston Company for the property they have placed on the road, the money advanced and expenses incurred in repairs and improvements with their losses and damages incurred while they were in possession of the road. Those matters should be first ascertained by reference to the master, and paid before a decree is made for a conveyance to the *cestuis que trust* as against this lease. 2 Story's Eq. J. section 1237, 799 ; 1 Story's R. 478 ; 6 Paige 390 ; 1 John. Ch. 481.

*Edwin Edgerton*, for the orators.

There has been much discussion whether the trust held by Knapp and Briggs, was an *active* or a *dry trust*. It was doubtless intended, and probably should be regarded as *active* until "*payment*," that is to say, the trustees, by the instrument of conveyance, were clothed with the power and subjected to the duty, to "hold" the estate, to "secure" and accomplish the payment; and until the accomplishment of this object, they should not, perhaps, be required, or allowed, to impart their title to the creditors in the mortgage upon the legal forfeiture of the estate by non-payment of the mortgage money at the time it fell due, but the trust and the duties of the trustees became so far *active*, probably, as to require them to assume a control and to place the property, by means of foreclosure and intervening rents and profits, in a situation to answer the "payment" of the mortgage debt. And this is precisely what the trustees did, by instituting proceedings for a foreclosure, and (by their application to chancery) placing the possession and acruing rents and profits in the hands of a receiver.

Suppose that, pending these proceedings, and before the foreclosure became absolute, payment of the mortgage had been made

by the mortgagors in money. All interest of the bondholders in the mortgage premises would thereupon have ceased, the equitable title with immediate right of possession would have become absolute in the mortgagors as sole *cestuis que trust*, and the trustees, although still holding the legal title, would have held it *naked* of all powers and without a single duty other than to transfer as the mortgagors should direct. The trust, under such circumstances would be changed from an " *active* " to a " dry " one, and chancery would not, for a moment, allow the trustees to withhold from the *cestuis* either the title or the possession. 1 Cr. Dig. 453, (marginal page), sec. 3 of title 12, chap. 1; *id.* 524, (marginal page), sec. 4 of title 12, chap. 4; *id.* 455 (marginal page), sec. 12 of title 12, chap. 1; *id.* 459, (marginal page), sec. 24 of title 12, chap. 1; *id.* 460, (marginal page), sec. 28 and 29 of title 12, chap. 1; *id.* 462, (marginal page), sec. 34 of title 12, chap. 1; 2 Eq. Dig. 498, sec. 24; 2 U. S. Eq. Dig. 633 sec. 515; *id.* 634 sec. 534. And so it is, as between the trustees and the bondholders. Upon the foreclosure on the 1st of January, 1857, the bonds all became *paid*, (3 Vt. 581, *Lovell* v. *Leland*,) the property itself specifically constituted their payment, the title of the mortgagors ceased, the exigency of the trust was thereby answered, and the estate became absolute at law in the trustees, but, in chancery, in the holders of the mortgage debt. (1 Cr. Dig. 483, title 12, chap. 2, sec. 1–2). Trustees, in such case, have no greater power over the estate, after a specific payment by foreclosure, than upon a payment in money before foreclosure, in either event the trustees have done what and all they were empowered by the grant to do; they have obtained " *payment.*" They need the title for no other purpose, and nothing remains to them but simply the duty to surrender to the party whose money is absorbed in the property, the same as they would have surrendered the money itself, if payment had come to them in that form.

Upon any other construction of this mortgage, the trust becomes perpetual, and the *cestuis* can never become entitled to the possession and management of the estate, a result which they could not have contemplated at the time they invested in the bonds.

In the consideration of a court of chancery, the bondholders

were, to all intents and purposes, the mortgagees; and, before the foreclosure, and while the bonds were in force, each was interested in the mortgage in proportion to the amount of his bonds. Upon the foreclosure, and by force of the decree the bondholders, in equity, became *owners of the estate*, in the same proportions as tenants in common. In this respect the effect of the foreclosure, in the name of Knapp and Briggs, is the same as if the bondholders had obtained it in their own names, as they might have done. 21 Vt. 331, 340, *Keyes and Ux.* v. *Wood et al.* ; *id.* 550, *Belding* v. *Manly et al.* ; 10 *id.* 293, *Pratt et. al.* v. *Bank of Bennington*; 2 Aik. 33, *King* v. *Harrington*; 24 Vt. 375, *Barron* v. *Barron et al.*, page 390.

As against Knapp and Briggs, the bondholders were entitled to the possession, and the execution of the lease by Knapp and Briggs was a breach of their trust. The Troy and Boston Company took the lease with notice of the trust title, and are in no better right, as against the *cestuis*, than Knapp and Briggs themselves. Willis on Trustees 219, note *a.* ; *id.* 216, note *n.* ; 2 Vern. 271, *Saunders* v. *Dehew.* The lessee of a trustee is in by way of the trust. *Id.* 85, note *g.* The estate of the trustee exists entirely for the benefit of a *cestui que trust.* *Id.* 85, note *i.* And the possession of the trustee, or his lessee, is the possession of the *cestui que trust.* *Id.* 84, note *d.*, and 85, note *h.* ; 3 Mer. Rep. 361, *Cholmondley* v. *Clinton.*

A trust estate is equivalent to the legal ownership, and in chancery, the legal consequences follow it. (1 Cr. Dig. 483, sec. 1–2,), and, among others, the right of possession in the tenants in common. (21 Vt. 340, *ut supra*). The inability of one of the common owners, (from idiocy, marriage, or other cause,) to enter, in person, upon the actual possession, does not affect the rights of the co-tenants. *All* have the *right* of possession, and such as are able may personally occupy, and those who are not may do so by guardian, or may at any time call upon those in possession to account for rents and profits. The right of possession is a *vested* right in the complainants, to which they should at once be admitted by decree. The right to a conveyance from the trustees, is also a present vested right. But the *time* of the conveyance may be delayed until, upon a reference to

a master, all the parties entitled, can be ascertained, as is sometimes done in cases of partition, when a decree passes for immediate possession, and for conveyance at a future time.    (2 P. Wms. 518, *Brook* v. *Hertford*).

There can be no practical difficulty in the present case in making the conveyance *to* the *cestuis* whenever they shall be known. They are all competent to *take* the title whether *sui juris* or not. (4 Cr. Dig. 24, sec. 37, title 32, chap. 2).    Their rights, in chancery, are all perfect now, and a conveyance of the legal title will add nothing to them in that forum.    The only necessity for a conveyance at all is, that they may protect themselves, if occasion require, in proceedings *at law*, where the legal title is allowed to prevail over the equitable.

It is believed that all the cases cited by the defendant's counsel, forbidding the trustees to convey to the *cestuis*, are cases of unexecuted trusts, where some active duty remains to the trustees, from the performance of which nobody but the *cestuis* can discharge them, and of course, if the *cestuis* are not *sui juris*, no such discharge can be given, and hence not only the right but the duty of the trustees, in such cases, to retain the title, without which they would be disabled to perform their trust.

And as to the power of the trustees to lease, (to which so many cases are cited) such power is conceded by the courts, so far as we have been able to examine, only where it is expressly given, or is incident and necessary to the execution of some other power expressed in the instrument creating the trust.

Redfield, Ch. J.    This bill is brought by the plaintiffs, holding a majority in amount of the bonds secured by the mortgage of the Western Vermont Railway, executed to Knapp and Briggs, as trustees for the holders of the bonds, praying a decree, that Knapp and Briggs, after the foreclosure of the mortgage, held no estate in the premises conveyed, except a mere nominal, naked, or dry trust, for the sole benefit of the *cestuis que trust*.    In other words, that the trust did not impose any functions or duties whatever, except to convey the estate to the *cestuis que trust* ; that it was a naked use of the character, which the statute of Henry VIIIth would have executed, without the formality of a convey-

ance : and as a consequence thereof, that the contract of lease, made by Knapp and Briggs to the Troy and Boston Railway Company, may be declared void, and an account taken of the profits made by the railway company, a receiver appointed, and the sum found due decreed to the plaintiffs and their associates.

I. The first, and the great inquiry in the case is in regard to the nature of the estate in the trustees, created by the mortgage, the forfeiture, and the foreclosure.

It is obvious that the estate must depend very much upon the implications growing out of the relations of the parties, and the duties consequent thereon ; and that these may change, from time to time, as circumstances change. That which begins as an active, responsible, and fiduciary trust, may, by lapse of time, and intervening relations, become merely a naked, dry trust, and *vice versa.* The nature and character of all trusts depend, almost exclusively, upon the implications growing out of the state of the property, the purposes desired to be accomplished, and the mode provided for that end. And it is one of the most important, and, at the same time, one of the most delicate and difficult offices of a court of equity, to raise these implications, with wisdom and justice, so that the full purpose and object of the trust shall be effected, without violence, or forced construction of the instrument under which the trusts are created.

All contracts are, more or less, subject to implications, constructive additions, and implied limitations. These are the powers, by which courts, in matters of contract, are enabled to make a brief memorandum, which does not express one-tenth part of what is intended, speak truly, and fully, the mind of the parties. These limitations and implications must indeed be conceived in the spirit of liberal, wise, and farsighted circumspection, or they will be liable to become a terror to all just sense of uprightness and fair dealing. Herein consists the power and the wisdom of courts of justice in the administration of civil jurisprudence, in making shreds and fragments, and even finess and indirection sometimes, subserve the ends of fair dealing and justice. It is to be expected that some cynical sneers will sometimes be heard with reference to these implications and constructive additions,

both as to contracts and statutes, either in more or less of the spirit of seriousness and complaint, or of badinage and pleasantry, or both perhaps.   But still the process must go on, so long as human imperfection and cultivated society, with its manifold and complicated relations, continue the same they now are.   It is not impossible that every case, which occurs in a court of justice, may give occasion for the exercise of something of this function of judicial construction.

But upon no subject is there so much demand for the exercise of construction, and of judicial implications, as in regard to trusts, and especially trusts of this complicated and public character. And these implications and constructive additions are not the less a part of the contract than its most express provisions.

There are extensive trusts connected with the whole subject of corporate action, which come under the class of what in the books are denominated constructive or implied trusts.   In one sense the corporation itself is a mere trustee, holding all its funds, and all its powers and franchises, in trust for the shareholders, who are the ultimate *cestuis que trust.*   So too, the directors of a corporation are mere trustees, holding their office, and performing their functions strictly as trustees for the benefit, ultimately, of the shareholders, and directly, and primarily of all having claims against the company.

The persons to whom these mortgage bonds are payable have not only the express trusts to perform, which are created by the terms of the deed under which they are made trustees, but they are also constructively trustees, (after the forfeiture, and taking possession of the road, which they may always do after condition broken,) for subsequent incumbrancers, for the corporation, and ultimately for the shareholders themselves.

But it is not with these classes of constructive or implied trusts, that we are cheifly at present concerned.   It is with the express trusts, created by the terms of the deed, when construed and expounded by the attending circumstances and the reasonable implications and necessary limitations, that we have to do at present.

We can not of course go much into detail here upon so extensive a subject as that of the construction of powers, and execu-

tory or active trusts.   The books are filled with cases of this
class, involving interests of the greatest magnitude, and where the
terms of the deeds or instruments, by which the trusts were
attempted to be created, were deficient in all specific definition of
the purposes expected to be accomplished, and especially in regard
to the mode of its accomplishment.   In all these cases the courts
of equity have not scrupled to carry out the apparent purpose of
the contract in the mode most consonant with the terms used, as
interpreted by the known and obvious rules of construction.   We
shall not stop to discuss a class of cases, so numerous, and all
tending to the same result, the accomplishment of the apparent
and obvious purposes of the contract.   We proceed at once to the
consideration of the nature of the trust created in the case before
us.

And it will scarcely require distinct enunciation here, that in
entering upon a subject so new, so difficult, and where the conse-
quences of mistake are likely to be of such importance to the
State and its citizens, we have attempted to proceed with reason-
able caution and circumspection ; and at the same time fairly to
meet the emergency, without shrinking from its weight or respon-
sibility, deeming it of the last moment, that upon such a subject
we start, if possible, in the right direction, and with a just com-
prehension of the interests at stake.

We think it could scarcely escape the notice of any one, who
had seriously and patiently attempted to master this question, that
until the actual foreclosure of the mortgage the trusts involved
in the contract and imposed upon the trustees named are entirely
fiduciary and executory.   At first, and so long as prompt payment
is made, it is understood, in practice indeed, that the office of such
trustees is rather silent, and the duties of the trustees, by means
of the negotiability of the bonds and of the coupons attached,
are ordinarily performed, or expected to be performed, by the
corporation or its officers.   If the interest in the coupons, and
the principal, as it falls due, are promptly paid by the corporation,
so that no forfeiture occurs, it will never become of sufficient
importance to consider the question, what is the precise nature of
the trust created by the contract in the first instance.

But after the forfeiture occurs either by non-payment of inter-

est or principal, or both, as in the present case, the duties of the trustees become, not only active and responsible but critical and delicate. It not only is not a dead, dry trust, but is one of the most active and momentous responsibility. We presume no man who had ever been placed in such position, and who had any proper sense of his position, would ever think of regarding or treating it as in any sense a trust of a nominal or indifferent character. It is not a dry trust at this point certainly, or if so, it is not in the sense of the books; if so in any sense, it is 'not so in regard to its duties or responsibilities.

The trustees must then elect between delay and action; between, on the one hand, taking possession of the road and its fixtures, and thereby assuming at once the vast public and private burdens and responsibilities of a great public work, forming, perhaps, a · necessary link in some great thoroughfare; and on the other, delay, and consequent further embarrassment, complication and loss; or they must undertake the ulterior and final remedy of foreclosure. And those persons, if any such there be, who could regard the discharge of such a trust, to be exercised in the face of such alternatives, as any formal or nominal affair, have certainly yet much to learn in regard to the nature of this business. For at this point it will not be assumed that the trustees could have surrendered the trust to to the *cestuis que trust*, or that they were in any condition to obtain counsel from them. It was the sole, or the first purpose of their office, that they should act, and should exercise their wisdom and discretion upon the possible occurrence of this very emergency. They were selected doubtless with reference to their capacity and responsibility for this very contingency, both by the corporation and the *cestuis que trust*, and neither of these parties had stipulated to deal directly with the other, but only with the trustees, as the responsible party. This duty they must meet and perform. This they did do.

The next inquiry is whether their functions ceased upon the foreclosure? When we look at the position of affairs at this time, it seems difficult to come to any such conclusion. The powers and duties of the corporation, in regard to the road and its franchises, under such a mortgage and foreclosure, must be regarded as effectually terminated for all practical purposes.

The trustees and the *cestuis que trust*, one or both, had effectually become the corporation, or had acquired all its essential rights, and assumed all its duties, so far as the public was concerned. And these were important and pressing. Delay for the shortest interval might be attended with disastrous consequences to the continuance of the franchise even, and must be so, in every view, to the interests of the *cestuis que trust*. The road could not, in strict propriety, be allowed to stop for a single day; and it could not be allowed to cease operation for any considerable time, with any safety to the interests of those to be affected by the depreciation of the property, and the intervention of counter interests and influences.

The *cestuis que trust*, the holders of these bonds, were a changing unorganized body, having no common bond of union, and no recognized principle of action, unless by unanimity of consent, which is practically impossible. It would not be expected, under such circumstances, that there should be an immediate surrender of the property to this heterogeneous and chaotic mass of men, women (single or married), and infants, many of whom were under such disabilities that they could not act for themselves, and where consequent delay must ensue in providing the means of obtaining their consent in a legal form, which must be fatal to the enterprise. All this must be regarded as in the contemplation of the parties at the time of entering into the contract, by which the bonds were issued. It must be so regarded in looking for the true construction of the contract, for in that we are attempting to obtain the mind and will of the parties at the time of making the contract in regard to the state of facts which has now intervened; and it will, perhaps, fairly test this, to ask ourselves, what would have been their probable response, had the inquiry then been put to the parties; What shall be done with this property, and how shall it be managed, in case of foreclosure? Shall the trustees continue to manage it for the time being, and until the order of the court or chancery, as in the case of other trusts? It seems to us there can be but one response to this question. The trustees seem to have been selected for this very office, among others, of controlling and managing the property in case of forfeiture and surrender, *as trustees*, for the benefit of the *cestuis que*

*trust*, in order to make it available for the payment of the bonds, both interest and principal. This must be so, until some organization of the bondholders, and the acquiring of some capacity to act, by a majority, or in some such way, as to enable them to discharge this new class of duties thrown upon them by the forfeiture of the condition of the mortgage, and the surrender of the road with its incidents and fixtures.

After the surrender and before foreclosure, as we have before intimated, while the control of the road for the benefit of the bondholders might fairly be presumed to be temporary, it could not with the least show of propriety be expected that any change in the principle of their mode of action should be attempted. Any one who accepted the office of trustee under a contract of this character, must be supposed to look directly at the reasonable probability of the occurrence of this contingency, the failure to pay promptly, and to have assumed his position with reference to the new duties resulting from the occurrence of such contingency, and would consequently be bound to perform the duties arising from it. And all the other parties in interest, the bondholders, the creditors of the corporation, in the order of their priority, the corporation itself, and ultimately the shareholders will have a vested interest in having these duties performed by such trustees under the security of their responsibility and capacity, both pecuniary and personal. And we do not well perceive how they can be relieved from this responsibility, except by the decree of the court of chancery, who alone have the legitimate control over such matters.

And it is well settled, in the court of chancery, that trustees are not to be removed, or discharged, from part of their trust, leaving them burthened with and responsible for the remainder. *Goodson* v. *Elliason,* 3 Russ. 594. Nor will such a trust be discharged until fully performed, or the *cestuis que trust* are in a condition to manage it themselves. Nor will trustees be changed except for sufficient cause, affecting the faithfulness and capacity of the trustee, or the interest of the *cestuis que trust,* or perhaps on account of the public interest, which is extensively concerned in trusts of this character. These are but elementary principles in the law of trusts, familiar to every one the least conversant

with the subject, and will be found distinctly laid down in the elementary treatises upon the subject.

And a trustee, once having assumed the office, is morally and legally bound to continue in the performance of its duties, until discharged by the order of the court of chancery, or the unanimous consent of the *cestuis que trust*, which in a case of this kind, where there are of necessity always more or less of infants, married women and others under disabilities, incapacitating them to act personally, or in any way effectually, except through the guardianship of the court of chancery, is morally impossible, and practically so except through the agency of a court of equity.

So that before the actual foreclosure of the mortgage, there can be no question whatever, that the trustees are the only responsible party in regard to the management of the property.

And after the foreclosure, it seems to us, that although the contingent interests are mostly cut off, and the number and character of the ultimate *cestuis que trust* very much changed (reduced in number, and simplified, in regard to their interests), the duties of the trustees and the necessity of their continuing to act, remain much the same.

The necessity of immediate and efficient action is precisely the same, and so is the difficulty or impossibility of accomplishing it through the *cestuis que trust;* and the utter ruin to the interests at stake in consequence of any considerable delay is none the less imminent. There would therefore seem to be a duty remaining in the trustees to manage the property for the benefit of the *cestuis que trust.* And this duty is to be estimated by the surrounding circumstances, and what a prudent owner would esteem reasonable under these circumstances. We do not say they are to perform this duty permanently, but they must do it until they can be legally exonerated.

II. And this duty must be performed in a manner to meet all the incidents of the case; taking into account the nature of the property, the public demands upon those who operate the road, and the duty of securing the greatest permanent return to the *cestuis que trust.* And not only the nature of the property, but the extent of the equipment included in the mortgage, and which comes to the trustees, must be considered.

We have then, in the present case:

1. An entire road of more than fifty miles in length with no adequate equipment whatever. And if the equipment were perfect, it is questionable how far the trustees are bound to assume the burden or responsibility of personally operating the road, farther than results necessarily from the fact that the legal title is in them, and that the public have no other party to look to in the first instance. But as they had no equipment in this case, it would not be expected they should attempt to purchase one. Under such circumstances we might expect prudent managers to look, either to a lease to some party owning a road in connection, and having sufficient rolling stock to operate both roads; or to some other party, having rolling stock, the use of which could be secured at a reasonable rate. Both of these modes were practicable in the present case. But it would seem that the one which the trustees elected was preferable, as imposing less risk and promising more return, especially after the short experiment, made by the trustees, of attempting to operate the road, by means of agents, with hired rolling stock, which produced a loss of some thousands of dollars in a few days.

2. This road was part of an important thoroughfare in the State, affecting transportation and travel to a large extent, thereby making it the duty of the public authorities to insist upon the strict and faithful performance of its public functions and duties. There were also rival lines of transportation and travel, whereby it became important to the interests of the *cestuis que trust*, that the operation of the road should not be suspended for even the shortest period of time; as such suspension would destroy confidence in its permanent efficiency, and produce a diversion of traffic, which could not fail to be seriously injurious to the interests of the *cestuis que trust*.

3. It was a species of property which could only be made remunerative by placing large interests, and long lines of communication, as far as practicable, under unity of control and management.

4. They could not consult the entire body of *cestuis que trust*, and their duty being due to the body severally they were not at liberty to follow the advice or wishes of the majority, as they

were still liable to the minority for faithful administration. And in showing this, the advice of the majority would be no more conclusive, in their favor than that of others, equally skilled and equally interested in the question. Having assumed the duty of faithful administration of the trust in behalf of the several owners of the bonds, they were not at liberty to shield themselves by anything short of showing the fact of such administration, or that they were excused by the owners' unanimous consent from the performance of their duty under the trust.

5. They must act without delay, and under the responsibility of being made liable for a breach of trust, if they failed to act in time, or to act with proper discretion, wisdom and forecast.

6. It was a trust of a character so entirely new, that very little light could be gained from any analogy to other trusts. Even the right of the trustee of real estate, held for the support and benefit of the *cestuis que trust*, where the right to lease for twenty-one years, or even for a much longer term, is unquestionable, could afford no satisfactory guide in a case like the present. There is a very essential difference between land and buildings, even where comparatively small repairs are required, to maintain them in tenantable condition; and a railway, where heavy expenditures are requisite from day to day. So that the powers and duties of trustees, in regard to lands and buildings and other real estate of that kind, are not in any just sense a guide for trustees of the character now under consideratian.

Under all these circumstances the question presents itself, as it occurred to the mind of the trustees, at the moment of the foreclosure. They would naturally try, as they did, the temporary expedient of operating the road on their own account, if the thing were practicable, as the test of this mode of administering the trust. This we think proved so disastrous, that the trustees ought not longer to have continued it, if any mode presented itself, whereby they could exempt themselves from loss, and especially if gain could be secured. The leasing the property to some connecting road was obviously the most hopeful expedient, practicable.

And it seems to us that the rent secured in the present case is quite as good as could reasonably have been expected. The

wonder is that the Troy and Boston Company could afford to pay so high a rent. The other conditions of the contract are not objected to, with the exception of two.

1. The provision in regard to repairs and renewals. This, it seems to us, must be regarded as sufficient. We are to understand this provision, as we do all the provisions of this, and of all contracts, with reference to the general purposes and objects of the contract, and what it is reasonable and natural to expect under it. We are not to suppose that the lessees will cease operating the road during the whole, or any considerable portion of the term, and then pay the rent, and perform the covenant in regard to repairs. The very supposition is little short of absurdity. It could not be done short of renewing the entire perishable portion of the superstructure of the road. The covenant is, that the lessees shall "return said road and property, both real and personal, at the termination of this lease, in as' good condition and repair in all respects as it now is in, natural wear only excepted."

This covenant, construed with reference to the subject matter of the contract and its other stipulations, imports that the road is to be kept in good running condition during the term, and returned in that condition. And all structures which by decay, or accident, become unsafe for use, must be renewed at the expense of the lessees. This, every one conversant with the subject must understand is a very onerous covenant, and one which secures to the lessors all that could be asked, or desired.

2. The length of the term is objected to. But with the condition for defeasance, which this lease contains, enabling the parties in interest, a majority in amount of the bondholders, to terminate it in one year by notice to that effect, we can not regard the length of the term, ten years, as being unreasonable. It is well known that a favorable lease for a much shorter term could not reasonably have been expected to be offered by any connecting road. It requires a considerable time to bring these extensive works into such a train of operation as to be made remunerative. Experienced directors would not venture upon a term which, if it went beyond a few months, did not extend over a considerable number of years. And as this is a case

where there is no reasonable probability that the bondholders would attempt to operate the road themselves, without an essential modification of their principle of action, through some definite organization, which certainly could not speedily be effected, as the law then stood, it would seem that the contract secured to them all that was desirable in regard to the shortness of the term. A longer term would in fact, no doubt, have been far better than a shorter one for the interest of the *cestuis que trust.*

Taking the contract all in all, and the circumstances of the property, there has never been any question, in our minds, that the contract must be regarded as a provident one, a very desirable one for the *cestuis que trust.* And if it were less so, we know of no principle of chancery law, by which it could be set aside in a court of equity, upon any such grounds, short of making a case, where the lessors had exceeded their powers, in assuming to enter into the contract.

It seems to be now well settled in the English courts, that railway contracts, and, indeed, all contracts by corporations, are not to be held invalid for any omission in the detail of preliminary proceedings, or in the provisions of the contract, unless the contract itself was *ultra vires.* In such case where the lessor has not the power to enter into the contract of lease, and the extent of such power is open equally to the knowledge of both parties, the lessee is bound to know the fact, and it is regarded as virtually bad faith to accept a contract where the other contracting party acted in a fiduciary relation, and which he had no power to execute. And it is upon this ground that the plaintiff proceeds, both in the bill and the argument, and we regard it as the only ground upon which the plaintiff's case can be supported.

The proposition of the want of power in the lessees to accept such a lease, which has been so much labored in argument, does not seem to us available on the part of the orators. The defendants, and their creditors, and shareholders, have and do acquiesce in the contract. It is one which, by the express provisions of our statute, it is competent for those having the control of Vermont railways to make with railways out of the State, connecting at the line of the State with such roads. And as it is a vexed question among those learned in the laws of New

York, how far the statutes of that State have authorized the defendants, the Troy and Boston Railroad Company, to accept such contract, we think it is not competent for the plaintiffs to claim any advantage on this ground, until the State of New York, or those interested in the Troy and Boston Railway interfere. This principle has been repeatedly recognized in this State by this court; *Noyes* v. *Rut. and Bur. Railway Co.*, 27 Vt. 110; *Rut. and Bur. Railway Co.* v. *Proctor*, 29 Vt. 93.

In regard to the validity of the mortgage nothing need be said. Both parties claim under it, and, consequently, are not in a position to raise that question; and if they were, it would not seem there could be much question in regard to it.

The view we have taken of the case renders it unnecessary to examine the other points raised in argument. Neither are we called upon at this time to give any intimation in regard to the action of the majority in amount of the bondholders, and whether it had the effect to terminate the lease. This bill was brought before the first year terminated, and does not of course base itself upon such ground. We could therefore only decide the case upon the grounds made in the bill, and other pleadings.

It will be perceived that the lease in this case was made before any statute existed in this State enabling the bondholders to organize themselves into a corporation, which will apply of course to contracts made after the law came in force; and we do not intend to intimate any opinion here how it might have affected the present case had it existed at the time of the foreclosure. The lease containing a power of revocation during the first year, by which its operation was limited to one year, if this power, thus reserved to the bondholders, was not exercised, it was of course by their own acquiesence and consent that the lease was extended beyond one year. And if that power was exercised, the lease was in effect a lease but for one year.

It may be proper to add, that if the contract in this case had contained no condition whereby it could have been terminated by the legal agency of the *cestuis que trust*, in some short but reasonable period, at the beginning of the term of lease, we probably might have regarded the lease as somewhat more questionable, so far as the power of the trustees is concerned. It is certain such

---

Austin *v.* Curtis et al.

---

a clause of revocation was highly prudent and proper, and the lease without this provision would wear a very different aspect, and perhaps merit a different consideration.

A majority of the court think the decree of the chancellor should be reversed, and the case remanded to the court of chancery, with instructions to dismiss the bill with costs, making such other orders in the case as may be required to preserve the interests of all concerned.

BARRETT, J., dissented from the opinion of the court. BENNETT, J., dissented from so much of it as affirmed the right of the trustees to make a lease for so long a period as ten years, but concurred on the other points, and in the judgment.