## Case No. 16,598.

UNITED STATES v. UNION PAC. R. CO. et al.

[11 Blatchf. 385; [1] 8 Am. Law Rev. 356.]

Circuit Court, D. Connecticut. Nov. 27, 1873. [2]

UNION PACIFIC RAILROAD COMPANY — SUITS BY UNITED STATES — ACT MARCH 3, 1873—CONSTITUTIONAL LAW — LAND GRANTS — RIGHTS OF SHAREHOLDERS.

1. The provisions of the 4th section of the act of March 3, 1873 (17 Stat. 509), directing a suit in equity to be instituted, in the name of the United States, against the Union Pacific Railroad Company and others, create different rules for the conduct of that suit from those by which ordinary suits are governed. Among such differences are the following: (1) Said suit may be brought in any circuit court of the United States, and all the parties may be made defendants in one suit. (2) Decrees in said suit may be entered and enforced against any one or more parties, without awaiting a final determination as to other parties. (3) The writs of subpœna issued against the defendants therein may run into any district of the United States, and be served by the marshal upon persons not residents of the district in which the suit is brought, and not found therein. (4) Such writs may be served upon representatives of deceased parties who are not residents of the district in which the suit is commenced, and whose testators were not such residents.

2. The powers and authorities given by the said act to the attorney-general are exceptional, and are limited, in their exercise, to the cases

---

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court; case unreported.]

[1] [Reported by Hon. Samuel Blatchford. District Judge, and here reprinted by permission.]

[2] [Affirmed in 98 U. S. 569.]

and the matters in that act specified, viz.: (1) To a suit in favor of the United States against the Union Pacific Railroad Company, and all persons who have subscribed for or received capital stock in said road which has not been paid for in full in money. (2). To a suit against persons who may have received, as dividends or otherwise, portions of the capital stock of said road, or the avails thereof, or other property of the said road, unlawfully and contrary to equity. (3) To a suit against persons who may have received. as profits or proceeds of contracts for the construction or equipment of said road, or other contracts therewith, money or other property which ought, in equity, to belong to said corporation. (4) To recover money, bonds, &c., which ought, in equity, to be paid or accounted for to the said company or to the United States.

3. For these causes, except the last, which is not set up in the bill, there is no right of action in the United States, nor can any be given by an act of congress. Such rights of action are the property of the railroad company. In substance and in form, the proceeds of the same belong to the corporation and not to the United States, or any other creditor, and suit to recover the same must be brought in the name of the railroad company.

4. Congress cannot create damages to be recovered by the United States by suit, or cause acts to be wrongs to the United States which are, in their nature wrongs to another.

5. The United States cannot convert to itself the property of another, by its own declaration, or its own authority; nor can it maintain an action, in its own name, against A., to recover a debt which he may owe to B.

6. The gifts of lands and bonds made by the United States to the Union Pacific Railroad Company were not in the nature of a trust, but were made absolutely, without condition precedent.

[Cited in Re Pacific Ry. Com'n, 32 Fed. 266.]

7. Redress for alleged fraudulent acts on the part of the directors and managers of the Union Pacific Railroad Company, in breach of their duty to the shareholders, cannot be obtained in a suit brought by the United States. but must be obtained in a suit brought by the corporation, or, if it refuses to sue, by a shareholder.

In equity.

George H. Williams, Atty. Gen., Aaron F. Perry, Thomas A. Jenckes, and J. Hubley Ashton, for the United States.

Benjamin R. Curtis, William M. Evarts, and Sidney Bartlett, for defendants.

Before HUNT, Circuit Justice, and SHIP-MAN, District Judge.

HUNT, Circuit Justice. This action was commenced during the summer of 1873, by process issuing from the district of Connecticut, and served upon defendants in other districts, who were not residents of Connecticut,. nor found therein to be served with process. The Union Pacific Railroad Company and twenty-four other defendants now demur to the bill of complaint filed by the complainant. The alleged grounds of demurrer are (1) that the complainant, by its bill, has not made a case which entitles it to any discovery or relief in a court of equity, from or against the defendants; (2) that the bill is multifarious.

The proceedings taken by the complainant are based upon the act of congress of March 3, 1873 (14 Stat. 509). To understand them, or to appreciate the argument on the demurrer, it is indispensable that this act should be carefully considered. It is a portion of the act making appropriations for the expenses of the government for the year 1874, and for other purposes, and is in the words following: "Sec. 4. That the attorney-general shall cause a suit in equity to be instituted in the name of the United States against the Union Pacific Railroad Company, and against all persons who may, in their own names or through any agents, have subscribed for or received capital stock in said road, which stock has not been paid for in full in money, or who may have received, as dividends or otherwise, portions of the capital stock of said road, or the proceeds or avails thereof, or other property of said road, unlawfully and contrary to equity, or who may have received. as profits or proceeds of contracts for construction or equipment of said road, or other contracts therewith, moneys or other property which ought, in equity, to belong to said railroad corporation, or who may, under pretence of having complied with the acts to which this is an addition, have wrongfully and unlawfully received from the United States, bonds, moneys, or lands which ought, in equity, to be accounted for and paid to said railroad company or to the United States, and to compel payment for said stock, and the collection and payment of such moneys, and the restoration of such property, or its value, either to said railroad corporation or to the United States, whichever shall, in equity, be held entitled thereto. Said suit may be brought in the circuit court in any circuit, and all said parties may be made defendants in one suit. Decrees may be entered and enforced against any one or more parties defendant without awaiting the final determination of the cause against other parties. The court where said cause is pending may make such orders and decrees, and issue such process, as it shall deem necessary to bring in new parties or the representatives of parties deceased, or to carry into effect the purposes of this act. On filing the bill, writs of subpœna may be issued by said court against any parties defendant, which writ shall run into any district, and shall be served, as other like process, by the marshal of such district. The books, records, correspondence, and all other documents of the Union Pacific Railroad Company shall at all times be open to inspection by the secretary of the treasury, or such person as he may delegate for that purpose. The laws of the United States providing for proceedings in bankruptcy shall not be held to apply to said corporation. No dividend shall hereafter be made by said company but from the actual net earnings thereof; and no new stock shall be issued or mortgages or pledges made on the property or future earnings of the company without leave of congress, ex-

cept for the purpose of funding and securing debt now existing, or the renewals thereof. No director or officer of said road shall hereafter be interested, directly or indirectly, in any contract therewith except for his lawful compensation as such officer. Any director or officer who shall pay or declare, or aid in paying or declaring, any dividend or creating any mortgage or pledge, prohibited by this act, shall be punished by imprisonment not exceeding two years, and by fine not exceeding five thousand dollars. The proper circuit court of the United States shall have jurisdiction to hear and determine all cases of mandamus to compel said Union Pacific Railroad Company to operate its road as required by law."

1. This act prescribes different rules for the conduct of this suit from those by which ordinary suits are governed. Omitting the questions upon the act which give rise to the demurrer, and which may be considered as of the merits of the case, I notice the following, as some of these differences: (1) The "said suit may be brought in the circuit court in any circuit, and all said parties may be made defendants in one suit." An objection that would ordinarily exist for a misjoinder of parties is cured by this provision. The objection of misjoinder of causes of action is cured by the same provision. The authority to bring a suit, and to implead various defendants, necessarily includes the right of stating the cause of action as it may exist against each of such defendants. (2) "Decrees may be entered and enforced against any one or more parties defendant, without awaiting the final determination of the cause against other parties." By the ordinary rules of chancery practice, a cause cannot be brought to a final hearing until it is ready for a hearing as to all the defendants. A final decree cannot be made against one defendant, leaving the interests of other defendants undetermined. Ordinarily, there is to be but one final decree, and in that decree all the rights and interests of all the parties, however complex or varied, are to be settled. The law we are considering prescribes a different rule, and in effect authorizes a severance of the one suit commenced into one hundred and seventy different suits, in which decrees may be entered as the court shall hold to be just, independent of the result as to any other defendant. Congress intended that the suit should be against many persons, that it should include causes of action not connected with each other, or which might be hostile to each other, against persons not charged in relation to the same transactions, and which could not, under the ordinary rules of law, be united in the same suit. (3) The most striking departure from the ordinary rules for the conduct of a suit is found in the following provision: "On filing the bill, writs of subpœna may be issued by said court against any parties defendant, which writ shall run into any district, and shall be served, as other like process, by the marshal of such district." By the judiciary act of 1789 the territory of the United States is divided into judicial districts, for which district courts are appointed; and circuit courts are organized, each circuit extending over one or more of said districts. By section 11 of that act (1 Stat. 78, 79) it is enacted, that "the circuit courts shall have original cognizance, concurrent with the courts of the several states, of all suits of a civil nature at common law or in equity, where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and the United States are plaintiffs or petitioners, or an alien is a party, or the suit is between a citizen of the state where the suit is brought and a citizen of another state. * * * But no person shall be arrested in one district for trial in another, in any civil action before a circuit or district court. And no civil suit shall be brought before either of said courts, against an inhabitant of the United States, by any original process, in any other district than that whereof he is an inhabitant, or in which he shall be found at the time of serving the writ." The present suit was commenced and is pending in the circuit court for the district of Connecticut. By force of the statute of 1873 the writs for the commencement of the suit have been issued into ten different states. These writs have been served, in those states, upon persons not inhabitants of the district of Connecticut, in which district the suit was commenced, nor found within that district at the time of serving the writ. I do not pause here to consider the effect of this provision, as a question of jurisdiction. The defendants insist that it is unconstitutional and void, as in violation of that article of the amendments to constitution of the United States (article 5) which provides that no person shall be "deprived of life, liberty, or property without due process of law," and they move to dismiss the bill on that ground. The provision is here important, as showing the difference in the conduct and management of this suit from that obtaining ordinarily in the circuit courts of the United States. For the present purpose, its validity is assumed. (4) The process is authorized to be served upon representatives of parties deceased, and it is not required that they shall be residents of the district of Connecticut, or that their testators should have been such residents. As a general rule, the power and authority of executors, both for the purpose of suing or being sued, is restricted to the state or district in which their letters are granted. The power of the executor to bring a suit is derived from his letters testamentary alone. Thus, an executor appointed by the courts of Connecticut, under authority of the statutes of that state, cannot bring a

suit in that character in the state of New York. His authority will not be recognized in the latter state, but he must be re-appointed under its authority before he can maintain an action. The principle is the same as to actions against executors and administrators. They must be called upon to respond within the local jurisdiction by which they are appointed. Their liability, as well as their authority, is thus locally limited. They are entitled to the benefits and protection of the laws which such local jurisdictions give them. Kerr v. Moon, 9 Wheat. [22 U. S.] 565; Armstrong v. Lear, 12 Wheat. [25 U. S.] 169; Vaughan v. Northup, 15 Pet. [40 U. S.] 1. This principle is overruled in the statute we are considering. As in the case of a former variation from the established rules of law, I assume, for the present, the validity of this provision, and refer to it here as one of the several differences to be found between the condition of the present action and that of an ordinary suit in the courts of the United States.

II. The powers and authorities by this act given to the attorney-general for the conduct of this suit, which have been pointed out, are, in their nature, exceptional and limited. They are not given to the attorney-general in all cases, but only in the case of the Union Pacific Railroad Company, and to redress the alleged wrongs specified in the act of 1873. It is quite safe to say, that it is not within the general powers of the attorney-general to institute a suit in which he would be relieved from an objection of the misjoinder of the parties, or of the misjoinder of causes of action, in which he could obtain final decrees against various defendants from time to time, and as often as he might be prepared for that purpose, and in which he could cause to be executed writs to bring in defendants residing in remote districts, and who were not found in the district where the suit was commenced. Generally, he may bring and maintain suits, subject to the ordinary rules of law. In the present instance, he insists, truly, that the act of 1873 confers extraordinary powers upon him. The act is his charter. Whatever is authorized by it (on the assumptions made) he may here do. Beyond it he cannot go. It thus becomes necessary to ascertain for what alleged wrongs, or for what causes of action, the attorney-general was directed by the act of 1873 to commence a suit. If the allegations of his bill are within the authority of that act, and if such allegations afford a good cause of action, his suit is maintainable; otherwise it is not.

III. For what causes of action, and against whom, was the attorney-general thus directed to institute proceedings? The act of 1873 directed a suit in equity to be instituted, in the name of the United States (1) against the Union Pacific Railroad Company, and all persons who may, in their own names, or through any agents, have subscribed for or received capital stock in said road, which stock has not been paid for in full in money; (2) against persons who may have received, as dividends, or otherwise, portions of the capital stock of said road, or the proceeds or avails thereof, or other property of said road, unlawfully and contrary to equity; (3) against persons who may have received, as profits or proceeds of contracts for construction or equipment of said road, or other contracts therewith, moneys or other property which ought, in equity, to belong to said corporation; (4) against persons who have wrongfully and unlawfully received from the United States bonds, moneys, or lands, which ought, in equity, to be accounted for and paid to said railroad company or to the United States. For these several causes of action, and for these only, the attorney-general is authorized, in this suit, "to compel payment for said stock, and the collection and payment of such moneys, and the restoration of such property, or its value, either to said railroad corporation or to the United States, whichever shall in equity, be held entitled thereto." If either the railroad corporation or the United States is equitably entitled to such moneys, it is declared that recovery therefor may be had in this suit. The recovery of money or property, and not the regulation and management of the road, or the disposition of its estate now or hereafter, is the object and purpose of the action. For the purpose of enforcing these four specified causes of action, and for no other purpose, is the attorney-general invested with the unusual powers conferred by the act of 1873.

IV. The United States is the plaintiff in this suit, and the question arises—Is there a right of action in the United States for the causes thus specified, or can a right to recover for such cause of action be given to the United States by an act of congress? Congress may well authorize its attorney-general to institute suits to recover damages due to the United States, or to redress wrongs which are legally wrongs to the United States, but its action can scarcely create such damages, or cause acts to be wrongs to the United States which are, in their nature, wrongs to another. The United States cannot convert to itself the property of another, by its own declaration, or its own authority; nor can it maintain an action, in its own name, against A., to recover a debt which he may owe to B. Moneys recovered by the United States in such an action, like its other funds, will go into its general treasury, and form a part of its resources, to be disposed of according to law. So, if any individual has committed a breach of trust, or been guilty of fraud in discharging his duties as an agent of the Union Pacific Railroad Company, the cause of action to redress such wrong and to recover damages therefor, and the damages themselves, when recovered, belong to the corporation. The suit for such redress must be in the name of the corporation,

as plaintiff. As a general rule, and under ordinary circumstances, no other party can be such plaintiff, and an authority by congress to the attorney-general to commence such action 'in the name of the United States, is valueless. Congress cannot thus appropriate to itself what belongs to another. To give effect to such an act would be to deprive one of his property without due process of law. I do not doubt the power of congress over the remedy to redress alleged injuries—in other words, its power to regulate the conduct of suits, or to prescribe the form of actions. But, it cannot, under the form of regulating the remedy, impair contracts, or dispose of rights of property. It cannot itself adjudge that moneys are due to the United States, and, by such judgment, give authority for their collection.

This principle applies to all the causes of action specified in the act of 1873, except to a portion of the fourth. Thus, if any person has subscribed for capital stock, or received capital stock or shares, in the Union Pacific Railroad Company, which have not been paid for, the action to recover the money payable by the terms of the subscription must be in the name of the corporation. The contract was made with the corporation, as an existing person. The money, if due at all, is, in terms, payable to the corporation as such. In law it must be recovered by the corporation, to be applied by it to the legal necessities of the railroad company. In substance and in form the money must go through and to the corporation, and no creditor, legal or equitable, can maintain an action for its recovery. In certain cases, if the corporation refuses to do its duty, such action may be maintained by the shareholders of the corporation, the corporation being made a party defendant. There may also be a case in which a judgment creditor can maintain an action against his judgment debtor and his creditor, to collect his debt, after his legal remedies are exhausted. Such was the case of Curran v. Arkansas, 15 How. [56 U. S.] 304. That, however, is not the present case. The debt of the United States has not yet matured. Its bonds, issued to the railroad company, have not become payable, and their payment, when they mature, is secured by a specific lien upon the road and its franchises. It is not a case for a creditor's bill. Whether the interest paid by the United States upon its bonds is a presently payable claim against the company is a question which has not been argued here, and which I do not decide.

The doctrines I have laid down are sustained by numerous authorities, of which I cite the following: Robinson v. Smith, 3 Paige, 222; Attorney General v. Insurance Co., 2 Johns. Ch. 371; Carlisle v. Railway Co., 1 Macn. & G. 689; Attorney General v. Railway Co., 1 Drew. & S. 154. See the cases cited in Heath v. Railway Co. [Case No. 6,306] In Robinson v. Smith [supra] the rule is laid down by Chancellor Walworth in these

words: "Generally, where there has been a waste or misapplication of the corporate funds by the officers or agents of the company, a suit to compel them to account for such waste or misapplication should be in the name of the corporation. But, as this court never permits a wrong to go unredressed merely for the sake of form, if it appeared that the directors of the corporation refused to prosecute, by collusion with those who had made themselves answerable by their negligence or fraud, or if the corporation was still under the control of those who must be made defendants in the suit, the stockholders, who are the real parties in interest, would be permitted to file a bill in their own names, making the corporation a party defendant. And, if the stockholders were so numerous as to render it impossible or very inconvenient to bring them all before the court, a part might file a bill in behalf of themselves and all others standing in the same situation." It is held in two of these cases, that, if an incorporated company acts illegally, in such manner as to endanger the public interest, it may be restrained from such action on a bill filed by the attorney-general. In many of the cases quoted in these authorities this position is doubted. But, I find no case justifying an action in the name of the sovereign, to recover money or property belonging to a corporation, illegally received by another, although obtained from the corporation by fraud or conspiracy. The power is confined to enjoining the commission of acts endangering the public interests, and does not extend to the recovery of money or property which belongs to the corporation. A suit for such recovery can only be maintained by the corporation, or, in certain exceptional cases, by one or more of its shareholders.

The cases of the contract with the Wyoming Coal & Mining Company, and the others set forth in the bill, come within the principles laid down in the cases cited. It is alleged that the Wyoming contract was made to give an unfair and unreasonable profit to the contractors, to give them a monopoly of the supply of coal for fifteen years, and that the contract was a fraudulent means of obtaining for the parties interested the advantages of the coal trade for the benefit of the individuals named, and against the interest of the railroad corporation. Again it is alleged of the Pullman Palace Car Company, that an agreement has been made, by which it obtains from the railroad company privileges and advantages which it is not for the interest of that company to give, and that the managers and stockholders of the railroad company fraudulently obtain for themselves profits which in equity belong to the railroad company. A similar statement is made in regard to the Omaha Bridge Transfer Company. Again, it is alleged that the cost of the railroad was less than one-half the sum represented by the stock and other outstanding liabilities of the company; and that much of

the stock and bonds of the company have been issued not in the interest of the company, but by the managers unlawfully to enrich themselves, and that high interest and commissions are habitually paid to the managers. The Hoxie contract is of the same general character, and is connected with the following transaction: It is alleged that the Credit Mobilier of America was an incorporation organized under the laws of Pennsylvania, with power, among other things, to contract for building railroads; that the defendants named, in pursuance of a design to control the Union Pacific road for their private benefit, and not for the purposes declared in the act of congress, obtained the control of the Credit Mobilier; and that the intention of the defendants named was to substitute the Credit Mobilier as a contractor in the place of those who had undertaken to perform the Hoxie contract. The means of accomplishing their purpose are set forth in detail, and it is alleged that large amounts of money, dividends, certificates of shares, mortgage bonds, land grants, and income bonds were issued to and received by the defendants named, on pretence of payment for building the road and telegraph line; and that the transaction was a fraudulent device of such defendants to put money in their own pockets.

The allegations of the bill represent the transactions respecting the Oakes Ames contract and the Davis contract to have been of a like design, and perfected in a like manner. It is alleged that the accounts respecting these pretended contracts yet remain unsettled, and that large balances are claimed against the railroad company. It is alleged that the stocks and bonds issued under these contracts should, in equity, be returned to the company for cancellation, or the amount thereof be paid the company in cash. In respect to Cornelius Bushnell, it is alleged that the managers permitted him to dispose of a large number of its bonds, and of other property, for which he has not accounted, and for which it refuses to compel him to account, and that the corporation sold to him certain other bonds at prices below their real value, and that he obtained a large sum of money as compensation for pretended services. All these transactions are alleged to be unlawful and illegal, and it is charged that Bushnell, and Scott, Carnigie, and Morgan, who confederated with him, are liable to the company for the amount thereof, with interest thereon.

This is the substance of the bill on this branch of the case. Upon the principles and authorities already expressed, the right of recovery for wrongs of this character is in the railroad corporation. Large amounts of money are involved, which belong to the corporation, and not to the United States; neither the damages nor the right of action belong to the United States. It is true in law, as alleged in the bill, that Bushnell, Scott, Carnigie, and Morgan are "liable to the company for the amount" claimed. The United States possesses no power to sue for and recover this debt due to the Pacific corporation, and can give none to its attorney-general.

These principles are quite consistent with the power of the United States to institute a suit to procure an adjudication that the charter of the corporation be declared forfeited, and that a receiver of its assets be appointed. The corporation coming into existence by virtue of a statute of the United States, it is quite likely that the federal courts have jurisdiction to adjudge such forfeiture, upon the proper allegations and proofs. In that event, a receiver would be appointed, representing the interests of all parties, who would administer upon the assets according to law. This remedy, however, the United States have not thought fit to pursue. They do not ask to have the corporation dissolved. They are content that it should continue in existence. They must recognize its rights as so continuing, and cannot ask that its affairs be administered as if it were dead. People v. Turnpike Co., 23 Wend. 193; Thompson v. People, 23 Wend. 537; Chesapeake & Ohio Canal Co. v. Baltimore & O. R. Co., 4 Gill & J. 1. So, I doubt not, that, for the purpose of fixing the rates of fare upon the road, according to the power reserved in section 18 of the act of July 1, 1862 (12 Stat. 497), congress may direct an examination into the cost of building and running the road, and, in an action with appropriate allegations, may cite the corporation to a discovery upon that subject, and for that purpose. Such, however, is not the theory of the present bill. So, it is quite probable that a bill can be filed for the purpose of securing the application of the five per cent. of net earnings in payment of the interest or principal of bonds issued, as provided in section 6 of said act of July 1, 1862. A discovery may be sought, and the suit may be retained to afford relief. But it is sufficient to say that such is not the intent of the present bill; that there are no adequate prayers for such an account; and that the allegations are not framed with reference to a bill to compel the company to pay this annual fund.

These objections apply, also, to a supposed right of action to protect the mortgage security of the United States: (1) It is not a cause of action against the remaining demurrants. (2) There is no allegation that the security of the road and the ties is now imperilled. They are just as valuable, whether laid by fraud and in extravagance, as if honestly and prudently laid. (3) It is said that, some years hence, new rails and ties will be needed, and that, if future fraud and misconduct occur, the security will be imperilled. This is not a present evil. None of these causes of action are fairly within the scope of the present suit.

V. But let us look at the question of a trust to be enforced, upon the supposition that the act of 1873 was intended to authorize such trust to be set up in the present suit. The claim of the plaintiff, upon this branch of the

case, is contained in the forty-second paragraph of the bill, and is as follows: "Forty-second. The grants to said Union Pacific Railroad Company in said acts of congress approved July 1, 1862, and July 2, 1864; of the right of way through the public lands for the construction of said railroad and telegraph line, and the right, power, and authority to take, from the public lands adjacent to the line of said road, earth, stone, timber, and other materials for the construction thereof, including, with said right of way to the extent of two hundred feet on each side of said railroad where it may pass over the public lands, the right to take all necessary grounds for stations, buildings, workshops, and depots, machine-shops, switches, side-tracks, and water-stations, and of every alternate section of public land designated by odd numbers, to the amount of ten alternate sections per mile on each side of said railroad, on the line thereof, and within the limits of twenty miles on each side of said road, and of the bonds of the United States and the proceeds thereof, issued to the said company, as well as of the other corporate property, rights, privileges, and franchises bestowed upon said Union Pacific Railroad Company by said acts of congress, were grants in aid of a public work of the United States, and for a public use, and, having been accepted by said corporation, the subject of each of such grants is held in trust by said corporation to be applied to such public use, and according to the intention of such grants, and to be accounted for. in such application; and the United States are entitled to have the trust so declared and carried into execution, and to have said property so applied and accounted for, and to have the misapplication of the same restrained by the injunction of this court, and the property or proceeds thereof so misapplied, restored to said corporation as such trustee, or to the United States."

Not only the lands granted and the bonds issued by congress to this road are here asserted to be the subjects of a trust which the United States are entitled to have executed, but the moneys received upon subscription to its stock made by individuals, and from all other sources, all its corporate property, in short, and its corporate rights, privileges and franchises. In the sense that all men are bound to deal honestly and act justly in the discharge of their duties, and that whoever receives benefits or advantages from the public, which are expected or intended to produce an advantage to some portion of the people of the country, assumes a trust to effect that advantage, the plaintiff's claim is true. It is not, however, accurate in a legal sense, to say of a bank incorporated for banking purposes, or of an insurance company, or of any similar institution, that it is a trustee of the government to effect the desired result, or that its property is impressed with a trust for that purpose, which may be enforced in the courts. Such corporation is chartered for private benefit as well as for public advantage, and is legally bound to administer its affairs for the public advantage only to the extent that it does not violate the provisions of its charter or the law of the land. With this limitation, such corporations are authorized to manage their own affairs for their own benefit, and such is the understanding of the government which grants a charter, and of the individuals who accept it. If, in this respect, a corporation should fail in its duty, the remedy is not by an attempt to enforce its supposed duties to the public as a trust, but to punish its illegal acts by a forfeiture of its charter.

The plaintiff's counsel base their argument of a trust upon the title of the said act of July 1, 1862, viz.: "An act to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific Ocean, and to secure to the government the use of the same for postal, military, and other purposes." No trust is declared in this title, or in the sections of the act in which this aid is extended. In section 3 it is enacted, "that there be and is hereby granted to the said company, for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores thereon," every alternate section of land, &c. In section 5 it is enacted, "that, for the purposes herein mentioned, the secretary of the treasury shall, upon the certificate" specified, issue to said company bonds of the United States, and "the issue of said bonds and delivery to the company shall, ipso facto, constitute a first mortgage on the whole line of the railroad and telegraph," and, upon failure to redeem the said bonds, the road and all its rights, functions, immunities, and appurtenances, and all granted lands which may remain unsold, may be taken possession of for the use and benefit of the United States: "Provided this section shall not apply to that part of any road now constructed." Not only is no trust expressed, but the idea thereof is excluded by taking a mortgage upon the road, the telegraph, its property, franchises, and all its granted lands, remaining unsold. The government does not rely upon the security of an uncertain and undefined trust, but takes an express mortgage, where it intends to secure to itself the performance of conditions by the company. The 6th section enacts "that the grants aforesaid are made upon the condition that said company shall pay said bonds at maturity, and shall keep said railroad and telegraph lines in repair and use, and shall at all times transmit despatches over said telegraph line, and transport mails, troops, and munitions of war, &c., upon said railroad. A condition precedent is that which is requisite in order that something else shall take effect, and without the existence of which that something else does not and cannot exist. Now, that these grants were made absolutely, that is, without condition precedent, is evident from the undisputed fact that the legal title to the lands vested at once in the corporation,

without interference from the government or claim of title on its part. The same is true of the bonds issued by the government. Stanley v. Colt, 5 Wall. [72 U. S.] 142, per Curtis, arguendo. and cases cited. The condition referred to can only be a condition subsequent, which congress may enforce or omit to enforce, at its pleasure, and which does not affect the title to the property, or the existence and powers of the corporation, until it is enforced. Its enforcement would not be as of a trust, but to declare a forfeiture of the charter, and to resume possession of the lands. And again, in section 17, congress specifies the mode in which it intends to secure the completion and keeping in repair of the road and telegraph. If the corporation fails to complete the road and telegraph within a reasonable time, or permits the same to remain out of repair, congress may pass an act to insure its speedy completion or repair, and may confiscate its subsequent income, to repay the expenditures caused by its delay or neglect. The next section provides, that, to enable it to accomplish the same purposes, congress may alter, amend, or repeal the act. These affirmative guards and securities furnish strong evidence that congress did not intend to rely upon a condition or an implied trust, to secure its rights. Whatever trust, guaranty, or protection it desired was reserved in express terms. Implications are thereby excluded. Leggett v. Dubois, 5 Paige, 114; Anstice v. Brown, 6 Paige, 448. The expressions, which it is claimed established a trust, were used that the act might show on its face that the bounty of congress was bestowed for a constitutional purpose.

It is apparent to the most superficial reader of the statutes, that the great object of congress was to bestow advantages, and from time to time to increase gratuities, to a corporation which should undertake the completion of a railroad to the Pacific. Conditions, restraints, or trusts were but little thought of. Thus, by the act of 1862 (section 3), there was granted to the Union Pacific Company 5 alternate sections per mile on each side of said railroad, and within the limits of 10 miles on each side thereof, equalling 6,400 acres per mile. In 1864, by an act of congress. this land grant was doubled in amount, and the enormous gift of 12,800 acres per mile was made to the road. And again, by its charter of 1862, the government undertook to issue its own bonds to the corporation, payable in 30 years, with interest. to the extent of $16,000 per mile, whenever 40 miles of said road should be completed. which bonds were declared to be a first mortgage upon the road and its property. By the act of 1864 it was provided, first, that the corporation might issue its own bonds to the extent thus specified, and that the lien of the United States' bonds should be subordinate to that of the company's bonds; and, secondly, that the corporate bonds might be issued. as provided. whenever and as often as 20 miles of road should be completed, instead

of 40, as first required. By section 11 of the first act it was enacted, that, in certain localities, the subsidy bonds of the government thus to be issued should be $32,000 per mile, and in still other localities that they should be $48,000 per mile. By the original act 15 per centum of the bonds to be delivered upon the completion of the sections of the road between certain points, and 25 per centum between certain other points, were required to be reserved until the whole of the road should be completed. and, if there was a failure to complete, should be forfeited to the United States. By the act of 1864 this reservation was abolished, and the whole amount was authorized to be delivered to the corporation.

The United States have granted lands in many instances to corporations. The 14th volume of the Statutes at Large will be found to contain five such cases (pages 210, 236, 239, 289, 292) The same general terms, with reference to the purpose of the grants and the use to be made of the road by the government. are contained in many of these acts. In 1850, congress granted land in aid of the construction of a railroad from Chicago to Mobile. in which it was enacted, that the railroad "shall be and remain a public highway, for the use of the government of the United States, free from toll or other charge upon the transportation of any property, or troops of the United States," and that "the United States' mail shall at all times be transported on the said railroad under the direction of the post office department, at such price as the congress may by law direct." 9 Stat. 467. Eleven similar cases, where the same language is used, are found in the two following volumes. 10 Stat. 9, 35, 156, 302; 11 Stat. 10, 16, 18–20, 22, 31. I cannot think that the government intended to reserve to itself a visitorial power over these corporations, the right to examine into their affairs, and, when not satisfactorily administered, to summon them before the courts for their regulation, or that it has done so. This railroad company is not a charitable corporation, nor were the grants for a charitable use. The grants of land and the issuing of bonds are to be considered as gifts, gratuities, voluntary contributions to aid in the construction of works which it was supposed would develop the resources of the country, advance its civilization and improvement. and upon which the mails and munitions of war could be transported. When given and accepted, the power of the donor is at an end, and the absolute ownership is in the corporations. The position of the government is that of a donor and not that of a creditor or a cestui que trust, except where such position is directly specified. Voluntary conveyance creates no presumption of a trust. 1 Hill, Trustees (4th Am. Ed.) 170, 171. The rights of the government are those which are expressly reserved, and do not arise from an implied trust.

No authority is cited to sustain the argument that such gifts or gratuities to a business corporation are in the nature of a trust, and

I have found none. The disposition of the law is against implied or constructive trusts. In Cook v Fountain, 3 Swanst. 585, the law is thus laid down by Lord Nottingham: "There is one good, general, and infallible rule that goes to both these kinds of trusts. It is such a general rule as never deceives, a general rule to which there is no exception, and it is this: The law never implies, the court never presumes, a trust, but in case of absolute necessity. The reason of this rule is sacred, for, if the court of chancery do once take the liberty to construe a trust by implication of law, or to presume a trust unnecessarily, a way is opened to the lord chancellor to construe or presume any man in England out of his estate, and so at last every case in court will become casus pro amico." See, also, Sturges v. Knapp, 31 Vt. 1. The cases in which trusts by implication have been enforced are usually those in favor of third parties, the presumed objects of the donor's bounty, and not in favor of the donor himself. The presumption is much slighter in the latter case than in the former.

The bill charges a series of fraudulent acts on the part of the directors and managers of the corporation enormous in extent and gross in character. I should have preferred to have found a mode of redressing these wrongs in the present suit, rather than to have reached the conclusion that this bill and this plaintiff cannot now and here afford it. Thus, it is said in the thirty-fifth paragraph, that the defendants, conspirators and managers of the Union Pacific Railroad Company, caused large amounts of money belonging to the corporation to be expended for unlawful purposes, upon objects not within the scope of the corporate powers of the company, to aid in procuring legislation from congress for their benefit, and in improperly influencing public officers in the discharge of their duties, and in litigation to which said corporation was not a party, or in which it had no interest, and for the private interests of the defendants hereinbefore named. Other offences equally or more heinous are specified, which must meet the condemnation of every honest man. I am of the opinion, however, that their redress must be sought through the corporation, unless they refuse to bring suit, in which case the action must be by a shareholder of the corporation.

The suggestions already made embrace all the causes of action provided for in the act of 1873, except the last, viz. the action against persons who have wrongfully and unlawfully received from the United States bonds, moneys, or lands which ought to be accounted for and paid to the United States. Where property has been wrongfully received from the United States, which ought to be accounted for and paid to them, a cause of action exists in its favor, for the recovery of such property. The allegations of the bill, however, and the conceded facts, do not cover this cause of action. The bill contains no allegation that any

person wrongfully holding them has received such bonds or moneys or property from the United States. In every instance referred to in the bill the property is stated to have been delivered by the United States to the corporation, and not to "the persons" against whom the action is authorized. This cause of action is not set up in the bill, and needs no further consideration.

Judgment must be ordered for the defendants, upon the demurrer, with leave to the plaintiffs to amend their bill, if they shall be so advised.

[The case was taken on an appeal to the supreme court, where the decree of this court was affirmed, Justices Swayne and Harlan, dissenting. 98 U. S. 569.]